UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO | Case No.: _____ |
| Plaintiff, | |
| v. | |
| ROBERT A. GUALTIERI, in his official capacity as Sheriff of Pinellas County, PINELLAS COUNTY, FLORIDA, PINELLAS COUNTY SHERIFF'S OFFICE, "COLONEL DANZIG", Pinellas County Sheriff's Office, "CAPTAIN NAPIER", Pinellas County Sheriff's Office, JASON P. FRANJESEVIC, Sergeant, Pinellas County Sheriff's Office, "SERGEANT VIENO", Pinellas County Sheriff's Office, "SUPERVISOR HOLLER", Pinellas County Sheriff's Office, "CORPORAL MERRITT", Pinellas County Sheriff's Office, "DEPUTY MOSES", Pinellas County Sheriff's Office, "DEPUTY COX, JR.", Pinellas County Sheriff's Office, "DEPUTY BERJE", Pinellas County Sheriff's Office, "CLASSIFICATION SPECIALIST WIDUA", "NURSE HILERY", ARNP, "DIXON", LMHC, and JOHN & JANE DOE SHERIFF'S DEPUTIES and/or CORRECTIONAL OFFICERS (1-10), | |
| Defendants. | |

## COMPLAINT
### AND DEMAND FOR JURY TRIAL
### INJUNCTIVE RELIEF SOUGHT

Plaintiff, CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO (hereinafter,

"Plaintiff" or "Karla"), by and through her undersigned attorney, sues Defendants ROBERT A.

GUALTIERI (hereinafter, "Sheriff Gualtieri"), PINELLAS COUNTY, FLORIDA (hereinafter,

"Pinellas County", the PINELLAS COUNTY SHERIFF'S OFFICE (hereinafter, "PCSO"), "COLONEL DANZIG" Pinellas County Sheriff's Office (hereinafter, "Danzig"), "CAPTAIN NAPIER" Pinellas County Sheriff's Office (hereinafter, "Napier"), "SUPERVISOR HOLLER", Pinellas County Sheriff's Office (hereinafter, "Holler"), JASON P. FRANJESEVIC, Sergeant, Pinellas County Sheriff's Office (hereinafter, "Franjesevic"), "SERGEANT VIENO", Pinellas County Sheriff's Office (hereinafter, "Vieno"), "CORPORAL MERRITT", Pinellas County Sheriff's Office (hereinafter, "Merritt"), "DEPUTY MOSES", Pinellas County Sheriff's Office (hereinafter, "Moses"), "DEPUTY COX, JR.", Pinellas County Sheriff's Office (hereinafter, "Cox"), "DEPUTY BERJE", Pinellas County Sheriff's Office (hereinafter, "Berje"), "CLASSIFICATION SPECIALIST WIDUA" (hereinafter, "Widua"), "NURSE HILERY", ARNP (hereinafter, "Hilery"), "DIXON", LMHC (hereinafter, "Dixon"), and JOHN & JANE DOE SHERIFF'S DEPUTIES and/or CORRECTIONAL OFFICERS (1-10), (hereinafter collectively, the "Defendants"), and avers as follows:

## **NATURE OF THE ACTION**

1.     This is a federal civil rights case pursuant to 42 U.S.C. § 1983 and under the Eighth and Fourteenth Amendments of the United States Constitution as applied to the states under the United States Constitution's Fourteenth Amendment for the Defendants' individual and collective personal, malicious, and unlawful violations under color of state law of Plaintiff's individual rights.

2.     Defendants committed these unlawful violations of Plaintiff's constitutional and state rights under color of state law in bad faith and with malicious purpose in reckless, wanton, and willful disregard of Plaintiff's human and safety rights.

3.      Plaintiff seeks relief, including declaratory and injunctive relief, compensatory damages, punitive damages, costs, and attorney's fees, pursuant to 42 U.S.C. § 1988.

## PARTIES

4.      Plaintiff is a natural person residing in Wimauma, Hillsborough County, Florida. At all times relevant to this action, Plaintiff was a resident of Pinellas County, Florida.

5.      Upon information and belief, Defendant Sheriff Gualtieri is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was the Sheriff of Pinellas County, Florida.

6.      Upon information and belief, Defendant Pinellas County is a political subdivision of the State of Florida with the capacity to sue and be sued.

7.      Upon information and belief, Defendant PCSO is a political subdivision of the State of Florida with the capacity to sue and be sued, and which operates the Pinellas County Jail.

8.      Upon information and belief, Defendant Danzig, is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Colonel in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

9.      Upon information and belief, Defendant Napier, is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Captain in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

10.      Upon information and belief, Defendant Holler, is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Supervisor in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

11.     Upon information and belief, Defendant Franjesevic, is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Sergeant in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

12.     Upon information and belief, Defendant Vieno, is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Sergeant in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

13.     Upon information and belief, Defendant Merrit, is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Corporal in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

14.     Upon information and belief, Defendant Moses is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Deputy in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

15.     Upon information and belief, Defendant Cox is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Deputy in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

16.     Upon information and belief, Defendant Berje is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was a Deputy in the Pinellas County Sheriff's Office working in the Pinellas County Jail.

17.     Upon information and belief, Defendant Widua is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, working for or with the Pinellas County Sheriff's Office in the Pinellas County Jail.

18.     Upon information and belief, Defendant Hilery is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was an Advanced Registered

Nurse Practitioner (hereinafter, "ARNP") working for or with the Pinellas County Sheriff's Office in the Pinellas County Jail.

19.     Upon information and belief, Defendant Dixon is a natural person residing in Pinellas County, Florida, and at all times relevant to this action, was licensed mental health counselor (hereinafter, "LMHC") working for or with the Pinellas County Sheriff's Office in the Pinellas County Jail.

20.     Defendants John & Jane Doe Correctional Officers/Sheriff's Deputies (1-10) (hereinafter, "Unknown Defendants"), are individuals whose names and addresses of residences are unknown.

## **VENUE AND JURISDICTION**

21.     Venue is proper in the Middle District Court of Florida, pursuant to 28 U.S.C. § 1391(b) and M.D. Fla. Loc. R. 1.02 (c), and Defendants' independent and collective malicious and unlawful violations under color of state law of Plaintiff's constitutional rights giving rise to the claims herein accrued within this district and division, as all Defendants work and/or reside in this district and division, and all of the acts and omissions giving rise to this action occurred in Pinellas County, which is in this district and division.

22.     The Court has subject-matter jurisdiction over the Plaintiff's federal law claims, pursuant to 28 U.S.C. §§ 1331 (federal question), and 1343(a)(3) (civil rights).

23.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 65.

24.     The Plaintiff is not immediately arguing any state law tort claims related to these federal claims that may form a part of the same case or controversy, due to conditions precedent to the filing of those claims as set forth in Florida Statute § 768.28. This Court would have

supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a), but cannot bring those claims at this stage, and will reassess at a later time whether to seek leave to amend this Complaint or to pursue those claims in state court.

25.     At all material times, the Defendants committed these unlawful violations under color of state law in bad faith and with malicious purpose in reckless, wanton, and willful disregard of the Plaintiff's human and safety rights.

26.     These constitutional law violations are "capable of repetition, yet evading review." Roe v. Wade, 410 U.S. 113, 125 (1973) (*citing* Southern Pacific Terminal Co. v. ICC, 219 U. S. 498, 515 (1911), Moore v. Ogilvie, 394 U. S. 814, 816 (1969), Carroll v. Princess Anne, 393 U. S. 175, 178-179 (1968), United States v. W. T. Grant Co., 345 U. S. 629, 632-633 (1953)).

27.     All conditions precedent to the maintenance of this action have been performed, have occurred prior to its institution or have been waived.

### FACTS COMMON TO ALL COUNTS

**A.     An Overview of Certain Medical Concepts Discussed Herein.**

28.     "Gender identity" is a well-established medical concept, referring to a person's internal sense of their own gender. All human beings develop this elemental conviction of belonging to a particular gender.

29.     Gender identity is innate and immutable.

30.     Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men.

31.     For transgender individuals, however, one's gender identity differs from the sex assigned to them at birth. Transgender men are men who were assigned "female" at birth but have

a male gender identity. Transgender women are women who were assigned "male" at birth but have a female gender identity.

32.     The medical diagnosis for the incongruence between one's gender identity and one's sex assigned at birth and the clinical distress resulting from this incongruence is Gender Dysphoria (previously known as Gender Identity Disorder).

33.     Gender Dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (hereinafter, the "DSM-5")[1] and International Classification of Diseases-10[2], World Health Organization (1992) (hereinafter, the "ICD-10").

---

[1] The DSM-5 describes the criteria as follows:

Gender Dysphoria in Adolescents and Adults 302.85 (F64.1)

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender(or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.

4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Diagnostic and Statistical Manual of Mental Disorders, *American Psychiatric Association*, 452-53 (5th ed. 2013).

[2] International Classification of Diseases-10, *World Health Organization* (1992).

34.     If left untreated, Gender Dysphoria can lead to serious medical problems, including clinically significant psychological distress, dysfunction, debilitating depression, and, for some people without access to appropriate medical care and treatment, self-harm, suicidality, and death.

35.     Leading medical and mental-health professional groups—including the American Medical Association, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the Endocrine Society, the National Association of Social Workers, and the World Professional Association for Transgender Health—all agree that Gender Dysphoria is a serious medical condition, and that treatment for Gender Dysphoria is medically necessary for many transgender people.

36.     The accepted standards of care for treating Gender Dysphoria are published by the World Professional Association for Transgender Health (hereinafter, "WPATH"), a professional association dedicated to establishing the standards for treating Gender Dysphoria.

37.     The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (hereinafter, the "WPATH Standards of Care") identify clinical guidance for health professionals to assist with safe and effective care for individuals with Gender Dysphoria. Eli Coleman et al., *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, Version 7, World Professional Association for Transgender Health (WPATH) (2012).

38.     The WPATH Standards of Care are recognized by the leading medical and mental-health professional groups as the authoritative standards for treating Gender Dysphoria.

39.     The Standards of Care apply equally to inmates, and expressly state:

> Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be

available to them if they were living in a non-institutional setting within the same community. . . . All elements of assessment and treatment as described in the SOC can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.

Id., at 67.

40.     The National Commission on Correctional Healthcare ("NCCHC") recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the WPATH Standards of Care. *NCCHC*, "NCCHC Policy Statement, Transgender Health Care in Correctional Settings" (October 18, 2009; *reaffirmed with revision* April 2015), http://www.ncchc.org/transgender-health-care-in-correctional-settings (visited August 14, 2020) (footnote omitted); *see also*, Smith, Brenda K., & Brisbin, Lorie, *PREA Standards and Policy Development Guidelines for Lesbian, Gay, Bisexual, Transgender and Intersex Inmates*, The Project on Addressing Prison Rape – National PREA Resource Center (December 18, 2012) https://www.prearesourcecenter.org/sites/default/files/library/lgbtiadultwebinarfinaljdi121812.pdf (visited August 14, 2020).

41.     Under the WPATH Standards of Care, treatment for Gender Dysphoria is designed to help individuals live congruently with their gender identity and thus eliminate the clinically significant distress. Treatment protocols include socially transitioning (dressing, grooming, and presenting oneself to others in accordance with one's gender identity), hormone therapy, and surgeries. The particular course of medical treatment varies based on the individualized needs of the person.

42.     Transgender individuals experience discord between their self-identified gender identity and the sex with which they were "assigned" at birth. Transgender men are individuals who were assigned female at birth but identify as men, and transgender women are individuals who were assigned male at birth but identify as women. *See, ex.*, Unger, Cécile A. (December 2016). "Hormone therapy for transgender patients". *Translational Andrology and Urology*. 5 (6): 877–884.

**B.      Plaintiff's Gender Dysphoria and Treatment.**

43.     At all times relevant to this action, and for several years prior to this action, Plaintiff has been living publicly as a woman, in accordance with her gender dysphoria.

44.     At all times relevant to this action, and for several years prior to this action, Plaintiff has not had access to proper health care for her gender dysphoria.

45.     As a result, and at all times relevant to this action, and for several years prior to this action, Plaintiff has been taking hormone replacement therapy (hereinafter, "HRT") medications without a prescription.

46.     Common effects of HRT medications on transgender women can include the following: growth of female breasts, an emotional sense of well-being, a significantly decreased sexual drive, loss of body hair, reversal of (head) hair loss, loss of muscle mass, redistribution of body fat to a more standard female presentation, and many other positive effects.

47.     However, abrupt withdrawal of HRT medications can cause the following: severe depression, suicide, chest pains, psychosis, mood disorders, autonomic hyperactivity, heart palpitations, and many other serious health issues, as well as a partial reversal of the "feminizing" effects of the HRT.

48.     Due to HRT, the Plaintiff has and had at all relevant times to this case, a completely female presentation, including full-sized female breasts, which require the wearing of female brassieres.

**C.     The Arrest and Incarceration of Karla Bello.**

49.     On March 11, 2019, the Plaintiff was issued by mail a citation for failing to stop for a red light on December 3, 2018, having been documented by a "Red Light Camera" with a fine of $261.00 due by April 10, 2019. (*See*, Traffic Citation AB8S6OE, attached hereto as **Exhibit "A"**, 002).

50.     The Plaintiff failed to pay the $261 fine for Traffic Citation AB8S6OE.

51.     On May 20, 2019, the Plaintiff was issued by mail a citation for failing to stop for a red light on October 11, 2018, having been documented by a "Red Light Camera" with a fine of $261.00 due by June 19, 2019. (*See*, Traffic Citation AAUXT5E, attached hereto as **Exhibit "B"**, 004).

52.     The Plaintiff failed to pay the $261 fine for Traffic Citation AAUXT5E.

53.     As a result of the Plaintiff's failure to pay traffic citations AB8S6OE and AAUXT5E, her driver's license was administratively suspended.

54.     On October 4, 2019, the Plaintiff was issued a citation for driving with a suspended license, a misdemeanor. (*See*, Traffic Citation AC7QEYE, attached hereto as **Exhibit "C"**, 006-007).

55.     On November 4, 2019, the Plaintiff failed to appear for the initial arraignment hearing in traffic case AC7QEYE, and a capias warrant was issued by Pinellas County traffic court judge Robert Dittmer.

56.     On November 29, 2019, the Plaintiff was arrested by the Gulfport Police Department pursuant to a capias warrant issued in the AC7QEYE case, with a bond of $513. (*See*, Complaint/Arrest Affidavit GP19-25811, attached hereto as **Exhibit "D"**, 009-010).

**D.     Karla Bello at the Pinellas County Jail.**

57.     On November 29, 2019, at 12:20PM, the Plaintiff was booked into the Pinellas County Jail (hereinafter, the "Jail"). (*See*, Pinellas County Sheriff's Office Subject Charge Report, attached hereto as **Exhibit "E"**, 012).

58.     In the Plaintiff's redacted inmate records, in the section for "Admission Assessment", under the category for "SVP Assessment 'Vulnerability'", the term "Inmate is LGBTI or gender non-conforming" is indicated by a "check" and is specified as "Transgender", showing that all Defendants were fully aware of Plaintiff's transgender status. (attached hereto as **Exhibit "F"**, 014-053, p. 038).

**a.  The Housing History Report.**

59.     The "Housing History" notes the following information:

| Housing | Arrival | Departure | House Change Reason | Status |
|---|---|---|---|---|
| CSOD-INTAK-REC-01-00B | 11/29/2019 12:21 | 11/29/2019 13:02 | Inmate Record Creation | Accepted |
| CSOD-INTAK-PRO-01-00 | 11/29/2019 13:02 | 11/29/2019 14:50 | | Unscheduled |
| CEN-2C1-UN01-U3-002 | 11/29/2019 14:50 | 12/02/2019 02:44 | Misdemeanor- House in Male Holding. se8712 | Scheduled |
| CEN-6C1-UN01-L7-001 | 12/02/2019 02:44 | 12/06/2019 11:12 | Minimum Custody Misd. SVP - Potential Victim. Veteran - no space in 2C2. ap7541 | Scheduled |
| HD-2H2-2H2B-B1-001 | 12/06/2019 11:12 | 12/09/2019 18:02 | Close Observation.  Minimum Misdemeanor Custody, SVP Potential Victim, Veteran - notified Dep Corkum 5891 | Scheduled |
| HD-3H4-3H4A-A-006 | 12/09/2019 18:02 | 00/00/0000 00:00 | Cleared Close Observation & Placed on Psych Observation (MHTU) Approved by Supervisor Holler, Minimum Misd. Custody SVP Potential Victim Veteran rg9825 | Scheduled |

(**Ex. "F"**, p. 019).

60.     As can be seen above, on December 2, 2019, there is a mention of her being housed "in Male Holding". (**Ex. "F"**, p. 019).

61.     Additionally, she is noted as "SVP Potential Victim" on December 2, 2019, December 6, 2019, and December 9, 2019. (**Ex. "F"**, p. 019).

62.     Furthermore, she is noted as placed in "Close Observation" from December 6, 2019 to December 9, 2019 and placed in "Psych Observation (MHTU)" from December 9, 2019 until her release. (**Ex. "F"**, p. 019).

### b.   DDC Incident Detail Report (02 DEC 2019).

63.     On December 2, 2019, Karla complained of having chest pains. (*See*, DDC Incident Detail Report DDCI-205807, attached hereto as **Exhibit "G"**, 055-057, p. 055).

64.     Specifically, Karla entered the following narrative into the kiosk at 3:53 P.M.:

> i have not recived hrt.[3] i signed to se amp nurse on friday. iv been off spironlactone,finersteride, and can feel chest pains. hormones unbalalanced. the lack of feedback about when ill see the arnp.
>
> (**Ex. "G"**, p. 056).

65.     The DDC Incident Detail Report DDCI-205807 (hereinafter, "Report 205807) was created by Moses, Merritt, and Franjesevic. (**Ex. "G"**, p. 055).

66.     In Report 205807, Karla is referred to with male pronouns and it lists her "sex" as "M". (**Ex. "G"**, p. 055).

67.     Report 205807 also states that Karla was "pat searched" prior to being permitted to see the nurse. (**Ex. "G"**, p. 055).

68.     Notably, in the "Supplement" section, the following is stated by Franjesevic, mocking Karla's medical issues:

> I was notified and responded. I agree with the actions taken by staff as outlined in this report. **Inmate Nogueda was medically evaluated for his alleged, "chest pains" by Nurse Hilery** and cleared to remain in his current housing assignment. Kiosk Case Message is attached to this report. Acting Shift Commander, Sergeant Vieno was notified.

---

[3] "HRT" is short for "Hormone Replacement Therapy", as described in ¶¶ 45-48.

(**Ex. "G"**, p. 055).

69.     Report 205807 is concluded by Franjesevic at 04:48PM, stating:

Inmate Nogueda was medically evaluated for his "Chest Pains" on 12/02/2019 at 1645 hours. Per Nurse Hillary, the inmate was cleared to remain in current housing.

(**Ex. "G"**, p. 055).

70.     Notably, again Franjesevic uses male pronouns to describe Karla, and also uses mocking scare-quotes around the words "chest pains". Id.

71.     This incident was also reported to Vieno (listed here as "Shift Commander"), Napier (listed here as "Division Commander"), and Danzig (listed here as "Department Commander"). (**Ex. "G"**, p. 055).

72.     Additionally, the "Sub-Catgory[sic]" on the following pages categorizes it as a "Division Commander Request". (**Ex. "G"**, pp. 056-057).

   **c.   DDC Incident Detail Report (06 DEC 2019).**

73.     On December 6, 2019, Merritt removed and "confiscated" Karla's undergarments. (*See*, DDC Incident Detail Report DDCI-206012, attached hereto as **Exhibit "H"**, 059-061).

74.     In DDC Incident Detail Report DDCI-206012 (hereinafter, "Report 206012"), Merritt himself described the incident as follows:

Inmate Bello-Nogueda was seen by LMHC Dixon in her office on the 6th floor. Per LMHC Dixon, Bello-Nogueda was placed on Close Observation status. **Utilizing the Attorney Visitation room for privacy, his personal undergarments were confiscated by me.** He was then seated adjacent to the Officer's Station in the 6th floor hallway and kept under constant observation. Once his relocation was scheduled in JIMS, I escorted him to Pre-Housing to await transport to the Healthcare Building. All of his personal property was inventoried and sent to the Property Room. Classification Specialist Widau authorized the relocation in JIMS. Sergeant Franjesevic was notified.

(**Ex. "H"**, p. 059).

75.     In Report 206012, Karla is referred to with male pronouns and lists her "sex" as "M". (**Ex. "H"**, p. 059).

76.     Additionally, Widau, Cox, and Berje are listed as being involved with Report 206012. (**Ex. "H"**, p. 059).

77.     Notably, Franjesevic is listed as having "Level 1 Approved" Report 206012, and stated the following in the "Supplement" section:

> I was notified and agree with the actions taken by staff as outlined in this report. Acting Shift Commander, Sergeant Vieno was notified.
>
> (**Ex. "H"**, p. 059).

78.     Vieno is also listed as having "Level 2 Approved" this Report.

79.     The "Inmate's Personal Property Inventory Form" attached to Report 206012 also shows that, in addition to her underwear, "Pencils (Colored)", Coffee, and "Other" were also taken. (**Ex. "H"**, pp. 060-061).

80.     This incident was also reported to Napier and Danzig. (**Ex. "H"**, p. 059).

**d.  Contact Log Report.**

81.     In the "Contact Log Report", on December 2, 2019 at 3:54 P.M., Moses entered the following "Informal Discipline" narrative:

> INFORMAL DISCIPLINE- WHILE NURSE HILERY WAS IN THE POD FOR DIABETIC CHECKS, BELLO BECAME EXTREMELY IRATE YELLING THAT HE NEEDS HIS MEDICATION. NURSE HILERY INSTRUCTED HIM TO SIGN UP FOR NURSE SICK CALL AS I DID BEFORE SHE ARRIVED. BELLO WAS VERBALLY COUNSELED AND PROGRESSIVE DISCIPLINE SHOULD FOLLOW ON FUTURE OCCURENCES.
>
> (**Ex. "F"**, p. 020).

82.     In the "Contact Log Report", on December 3, 2019 at 10:45 A.M., "aberje" (presumably Berje) entered the following "Informal Discipline" narrative:

> INFORMAL DISCIPLINE- CAUGHT IN THE LOWER TIER BATHROOM APPLYING COLORED PENCIL TO HIS EYEBROWS AND TO HIS FACE AS MAKEUP. VERBALLY COUNSELED THAT THIS IS NOT ALLOWED AND WILL NOT BE TOLERATED

> (**Ex. "F"**, p. 020).

83.     In the "Case Note Details", user "semanuels"[4] entered the following on November 29, 2019: "Misdemeanor- House in Male Holding. se8712". (**Ex. "F"**, p. 027).

84.     In the "Case Note Details", user "apaolillo"[5] entered the following on December 2, 2019: "Minimum Custody Misd. SVP - Potential Victim. Veteran - no space in 2C2. ap7541". (**Ex. "F"**, p. 027).

85.     In the "Case Note Details", user "cwidua" (presumably Widua) entered the following on December 6, 2019: "Close Observation. Minimum Misdemeanor Custody, SVP Potential Victim, Veteran - notified Dep Corkum 5891 -cw9431". (**Ex. "F"**, p. 027).

86.     In the "Case Note Details", user "rgreen"[6] entered the following on December 9, 2019: "Cleared Close Observation & Placed on Psych Observation (MHTU) Approved by Supervisor Holler, Minimum Misd. Custody SVP Potential Victim Veteran rg9825". (**Ex. "F"**, p. 027).

87.     On December 9, 2019, Karla filed the following "Property Request":

> need debit card number to order comisary. can i request my make up bag please. i have property like my underwear in a bag. i had a coffee bag colored pencils.

> (**Ex. "F"**, p. 035).

---

[4] The Plaintiff does not currently know to whom this username refers at present.
[5] The Plaintiff does not currently know to whom this username refers at present.
[6] The Plaintiff does not currently know to whom this username refers at present.

88.     In response to that request, "Dep. Mari #55653" responded:

You can't receive your debit card number to place commissary orders. No make up ids allowed. If you have personal under garments that would not be considered contraband, you can request those items.

(**Ex. "F"**, p. 035).

89.     On December 10, 2019, Karla filed the following "Property Grievance":

i ned a bra at minimum. im a ts woman,transgender, and ben on hrt over three years. to grow a bust. why do i have to show everyman my boobs when i get changed. my chest huts due to anxiety or potassium levels unbalanced. due not geting hrt since ive ben here. its hard to breath at times.

(**Ex. "F"**, p. 032).

90.     On December 10, 2019, at 11:30 A.M., the undersigned visited Karla via video-call, and learned of her placement in the "male" section of the Jail, and of the various other incidents described herein. (**Ex. "F"**, p. 031).

91.     It is clear that the actions of Defendants Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants reflect a custom, policy, and practice of Defendants PCSO, Pinellas County, and Sheriff Gualtieri.

## COUNT I
## DEPRIVATION OF EQUAL PROTECTION – INJUNCTIVE RELIEF
### U.S. Const. Amend. XIV

Plaintiff, KARLA BELLO, hereby sues Defendants PCSO, Pinellas County, and Sheriff Gualtieri for purposes of seeking declaratory and injunctive relief pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

92.     Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 91 as though fully set forth herein.

93.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

94.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

95.     It is well settled that "discrimination against a transgender individual because of [his or] her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." Glenn v. Brumby, 663 F.3d 1312, 1317 (11th Cir. 2011); cf. Bostock v. Clayton County, 590 U.S. ——, 140 S. Ct. 1731, 1741, —— L.Ed.2d —— (2020) (confirming that "it is impossible to discriminate against a person for being ... transgender without discriminating against that individual based on sex").

96.     As a result, the policies at issue in this case are subject to review based upon heightened scrutiny. See, ex., Adams by & through Kasper v. Sch. Bd. of St. Johns County, 18-13592, 2020 WL 4561817, at *5 (11th Cir. Aug. 7, 2020).

97.     Defendants PCSO, Pinellas County, and Sheriff Gualtieri violated the Plaintiff's Fourteenth Amendment rights by enacting and following policies and practices that cause constitutional violations to transgender people, including the Plaintiff (hereinafter, the "Policies").

98.     The Plaintiff hereby facially challenges the Policies regarding transgender people.

99.     The Policies discriminate against transgender people on the basis of sex, which includes discrimination based on gender nonconformity, gender identity, transgender status, and gender transition.

100.    The Policies facially classify people based on sex, gender identity, and transgender status.

101.    The Policies treat transgender people differently than non-transgender people who are similarly situated.

102.    Under the Policies, non-transgender people are able be assigned to jail housing according to their gender identity, to access restrooms and other single- sex facilities consistent with their gender identity, and to receive medical care consistent with their gender identity, but transgender people are prevented from jail housing consistent with their gender identity, banned from restrooms and other single-sex facilities consistent with their gender identity, and are denied medical care consistent with their gender identity.

103.    The Policies facially discriminate against transgender people based on gender nonconformity. For example, although the Plaintiff is a woman, is perceived as a woman in public, and has had medical treatment to bring their body into alignment with her female gender identity, her birth certificate and other identification documents have "male" gender markers that do not conform to the societal expectations of women. Furthermore, had the Plaintiff been assigned female at birth, she would not have been excluded from the female housing, from the restrooms and other single-sex facilities consistent with her gender identity, and would have been given the medications consistent with well-established medical guidelines. No person has any control over the sex that person is assigned at birth.

104.    The Policies' discrimination against transgender people based on sex is not substantially related to any important government interest. Indeed, it is not even rationally related to any legitimate government interest.

105.    The Policies endanger the safety, privacy, security, and well-being of transgender individuals. For example, transgender women are highly likely to be harassed, attacked, sexually

assaulted, or even murdered by male prisoners who believe that she should not be in the men's housing, restrooms, or other male-only locations of the Jail.

106.    The Policies do not promote the safety, privacy, security, or well-being of non-transgender people.

107.    The Policies deprive transgender people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

108.    The Policies' discrimination against transgender people based on sex denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

109.    Discrimination based upon transgender status warrants heightened scrutiny for the additional following reasons.

110.    Transgender people have suffered a long history of extreme discrimination in Florida and across the country and continue to suffer such discrimination to this day.

111.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

112.    A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

113.    Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

114.    Gender identity generally is fixed at an early age and highly resistant to change through intervention.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a. Declaring that the provisions of and enforcement by Defendants PCSO, Pinellas County, and Sheriff Gualtieri of the Policies as discussed above violate the Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

b. Preliminarily and permanently enjoining enforcement by Defendants PCSO, Pinellas County, and Sheriff Gualtieri of the Policies as discussed above;

c. Requiring Defendants PCSO, Pinellas County, and Sheriff Gualtieri in their official capacities to allow individuals, including transgender people, to be assigned to jail housing, and to use single-sex facilities in accordance with their gender identity; and requiring Defendants PCSO, Pinellas County, and Sheriff Gualtieri in their official capacities to enact and to continue to enforce anti-discrimination protections for transgender people;

d. Awarding the Plaintiff her costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

e. Granting such other and further relief as the Court deems just and proper.

f. The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

## COUNT II
## CRUEL AND UNUSUAL PUNISHMENT – INJUNCTIVE RELIEF
### U.S. Const. Amend. VIII

Plaintiff, Karla Bello, hereby sues Defendants PCSO, Pinellas County, and Sheriff Gualtieri, for purposes of seeking declaratory and injunctive relief pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

115. Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 114 as though fully set forth herein.

116. The Eighth Amendment prohibits the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend VIII.

117. Under the Amendment, the "[f]ederal and state governments ... have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991).

118. As particularly relevant here, the Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104 (1976).

119. A deliberate indifference claim entails both an objective and a subjective component. Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).

120. First, the inmate must establish "an objectively serious medical need"—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"—that, "if left unattended, poses a substantial risk of serious harm." Id. (alteration adopted) (quotation omitted).

121. Second, the inmate must prove that prison officials acted with deliberate indifference to that need by showing (1) that they had "subjective knowledge of a risk of serious harm" and (2) that they "disregard[ed]" that risk (3) by conduct that was "more than mere negligence." Id.

122. Plaintiff is a transgender woman with Gender Dysphoria, a serious medical condition.

123.    Defendants PCSO, Pinellas County, and Sheriff Gualtieri were aware that Plaintiff has Gender Dysphoria and was receiving hormone therapy and expressing her female gender in all aspects of her life prior to her incarceration.

124.    It is medically necessary for Plaintiff to live as female, to receive hormone therapy, and to receive all other treatment for Gender Dysphoria deemed medically necessary by a qualified provider.

125.    Defendants PCSO, Pinellas County, and Sheriff Gualtieri nevertheless refused to provide Plaintiff with hormone therapy or to recommend that she be permitted access to female clothing and grooming standards. This refusal was <u>not</u> based on a medical judgment concerning Plaintiff's medical needs.

126.    As a result of being denied access to female clothing and grooming standards and of being cut off from and denied hormone therapy by Defendants PCSO, Pinellas County, and Sheriff Gualtieri, Plaintiff has suffered severe psychological distress and physical harm, including suicidal ideation/suicide attempts, such that she was placed on psychiatric observation in the Pinellas County Jail's Mental Health Treatment Unit.

127.    Defendants PCSO, Pinellas County, and Sheriff Gualtieri were aware that Plaintiff was seeking hormone therapy and access to female clothing and grooming standards to treat her Gender Dysphoria; that proper, necessary medical care for Plaintiff's Gender Dysphoria includes allowing her to live as female and providing her with hormone therapy; and that the denial of this needed medical care caused serious harm to Plaintiff. Yet they deliberately denied her that care.

128.    This denial of treatment constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment.

129.    The Plaintiff facially challenges the policies that have resulted in this denial of treatment.

130.    At all relevant times, Defendants PCSO, Pinellas County, and Sheriff Gualtieri were acting under color of state law.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

    a.    Declaring that the Defendants PCSO, Pinellas County, and Sheriff Gualtieri are denying Plaintiff medically necessary treatment for Gender Dysphoria in violation of the Eighth Amendment to the United States Constitution;

    b.    Enter a permanent injunction directing Defendants PCSO, Pinellas County, and Sheriff Gualtieri to provide to transgender individuals hormone therapy, access to female clothing and grooming standards, and all other treatment for Gender Dysphoria deemed medically necessary by a qualified professional in the treatment of the condition, including where that individual was undergoing hormone therapy outside of the treatment of such a professional;

    c.    Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants pursuant to 42 U.S.C. § 1988; and

    d.    Award all other relief that this Court deems just and proper.

### COUNT III
### 42 U.S.C. § 1983 – RECKLESS INDIFFERENCE TO PLAINTIFF'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS (MONELL)
### U.S. Const. Amend. XIV

Plaintiff, Karla Bello, hereby sues Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Sheriff Gualtieri, in his official capacity, for purposes of seeking declaratory

and injunctive relief pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

131.     Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 130 as though fully set forth herein.

132.     Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Sheriff Gualtieri's official and unofficial policies and customs encouraged, caused, allowed, and/or enabled Defendants Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants to violate Plaintiff's constitutional rights without fear of discipline for those violations. *See*, Monell v. Department of Social Services, 436 U.S. 658 (1978).

133.     Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Sheriff Gualtieri have not disciplined Defendants Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants for their violations of Plaintiff's constitutional rights and therefore has implicitly approved, ratified, or adopted, Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants's unconstitutional actions, yet Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Sheriff Gualtieri is responsible for Defendants' supervision, training, and discipline through its policy-making powers and personnel decisions.

134.     There is an obvious need for Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Sheriff Gualtieri to train all of the Pinellas County Jail employees and agents on Eighth and Fourteenth Amendment rights, particularly with respect to transgender people. Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Robert A. Gualtieri

have therefore demonstrated a policy of deliberate indifference to such civil rights violations. *See*, <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989).

135.    Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Sheriff Gualtieri's callous, reckless, wanton, and malicious actions under color of state law before, during, and after the incidents described herein, have caused the Plaintiff to suffer and continue to suffer the damages that the Plaintiff has described.

136.    These deprivations under color of state law are actionable under and may be redressed by 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

    a.    Direct the entry of judgment for Plaintiff against Defendants Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Robert A. Gualtieri for damages;

    b.    Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants pursuant to 42 U.S.C. § 1988; and

    c.    Award all other relief that this Court deems just and proper.

**<u>COUNT IV</u>**
**<u>42 U.S.C. § 1983 – DEPRIVATION OF PLAINTIFF'S</u>**
**<u>CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS</u>**
**U.S. Const. Amend. XIV**

Plaintiff, Karla Bello, hereby sues Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants, in their individual capacities, for purposes of seeking damages pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

137.    Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 136 as though fully set forth herein.

138.    Defendants Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants repeatedly, willfully, and maliciously deprived the Plaintiff of her Fourteenth Amendment rights by treating her differently from non-transgender prisoners, constituting discrimination on the basis of sex, and for concerted attacks on her solely because of her transgender status, including, but not limited to: forcing her to live in the male population; forcing her to shower with and expose herself to, members of the male sex, including both inmates and Pinellas County Jail employees; forced removal of her undergarments by male Pinellas County Jail employees; refusal to allow the Plaintiff to wear female undergarments; dehumanizing Plaintiff and refusing to provide any medical aid for her serious and debilitating withdrawal symptoms caused by their refusal to provide Plaintiff with her hormones and other medications; forcibly searched by male officers; and by dehumanizing Plaintiff's gender identity by refusal to acknowledge that she is a woman.

139.    These deprivations under color of state law are actionable under and may be redressed by 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a.  Direct the entry of judgment for Plaintiff against Defendants Defendants Pinellas County Sheriff's Office, Pinellas County, Florida, and Robert A. Gualtieri for damages;

b.  Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants pursuant to 42 U.S.C. § 1988; and

c.   Award all other relief that this Court deems just and proper.

## COUNT V
## 42 U.S.C. § 1983 – DEPRIVATION OF PLAINTIFF'S
## CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS
### U.S. Const. Amend. VIII

Plaintiff, Karla Bello, hereby sues Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants, in their individual capacities, for purposes of seeking damages pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

140.   Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 139 as though fully set forth herein.

141.   Defendants Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants repeatedly, willfully, and maliciously deprived the Plaintiff of her Eighth Amendment rights by refusing to provide her with any medical or non-medical treatment for her Gender Dysphoria, and for concerted attacks on her solely because of her transgender status, including, but not limited to: forcing her to live in the male population; forcing her to shower with and expose herself to, members of the male sex, including both inmates and Pinellas County Jail employees; forced removal of her undergarments by male Pinellas County Jail employees; refusal to allow the Plaintiff to wear female undergarments; dehumanizing Plaintiff and refusing to provide any medical aid for her serious and debilitating withdrawal symptoms caused by their refusal to provide Plaintiff with her hormones and other medications; forcibly searched by male officers; and by dehumanizing Plaintiff's gender identity by refusal to acknowledge that she is a woman.

142.   These deprivations were committed under color of state law and are actionable under and may be redressed by 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

   a. Direct the entry of judgment for Plaintiff against Defendants Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants for damages;

   b. Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants pursuant to 42 U.S.C. § 1988; and

   c. Award all other relief that this Court deems just and proper.

**COUNT VI**
**42 U.S.C. § 1983 – DEPRIVATION OF PLAINTIFF'S**
**CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS**
**U.S. Const. Amend. XIV**

Plaintiff, Karla Bello, hereby sues Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants for purposes of seeking damages pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

143.    Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 142 as though fully set forth herein.

144.    Defendants Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants repeatedly, willfully, and maliciously deprived the Plaintiff of her Fourteenth Amendment rights by singling her out and treating her differently than non-transgender prisoners, including by refusing to provide her with any medical or non-medical treatment for her Gender Dysphoria, and for concerted attacks on her solely because of her transgender status, including, but not limited to: forcing her to live in the male population; forcing her to shower with and expose herself to, members of the male sex,

including both inmates and Pinellas County Jail employees; forced removal of her undergarments by male Pinellas County Jail employees; refusal to allow the Plaintiff to wear female undergarments; dehumanizing Plaintiff and refusing to provide any medical aid for her serious and debilitating withdrawal symptoms caused by their refusal to provide Plaintiff with her hormones and other medications; forcibly searched by male officers; and by dehumanizing Plaintiff's gender identity by refusal to acknowledge that she is a woman.

145.    These deprivations were committed under color of state law and are actionable under and may be redressed by 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a.    Direct the entry of judgment for Plaintiff against Defendants Sheriff Gualtieri, Danzig, Napier, Franjesevic, Vieno, Merritt, Moses, Cox, Berje, Widua, Hilery, Dixon, and Unknown Defendants for damages;

b.    Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants pursuant to 42 U.S.C. § 1988; and

c.    Award all other relief that this Court deems just and proper.

Dated: 24 AUGUST 2020.

Respectfully Submitted,

_____

ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
222 San Marco Ave., Ste. C

St. Augustine, FL 32084
904.602.9400 (Office)
904.299.5400 (Fax)
reringer@lentolawgroup.com
*Attorney for Plaintiff*
TRIAL COUNSEL


JOSEPH D. LENTO, ESQ.
(Pro Hac Vice to be applied for)
LENTO LAW GROUP, P.A.
1500 Market Street – 12th Floor
East Tower
Philadelphia, PA 19106
267.833.0200 (Office)
267.833.0300 (Fax)
Jdlento@lentolawgroup.com
*Attorney for Plaintiff*
TRIAL COUNSEL