UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO<br><br>Plaintiff,<br><br>v.<br><br>ROBERT A. GUALTIERI, in his official capacity as Sheriff of Pinellas County, PINELLAS COUNTY, FLORIDA, et al.,<br><br>Defendants. | Case No.: 8:20-cv-02005-TPB-AEP |

**PLAINTIFF'S RESPONSE TO DEFENDANT PINELLAS COUNTY'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT (Dkt. 33) AND INCORPORATED MEMORANDUM OF LAW**

COMES NOW the Plaintiff, CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO (hereinafter, "Plaintiff" or "Karla"), by and through her undersigned attorney, and hereby responds in opposition to Defendant Pinellas County's Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. 33) (hereinafter, the "Motion to Dismiss")[1] and states as follows:

1. This is a federal civil rights case pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution for the Defendants' individual and collective personal, malicious, and unlawful violations under color of state law of Plaintiff's individual rights.

---

[1] Notably, and *unlike the motions to dismiss filed by many of the other Defendants in this action*, the Undersigned appreciates the counsel for the Defendant's professionalism and *lack* of insulting, discriminatory, and transphobic language in the Motion, as counsel for the Defendant appears to be familiar with Florida Rule of Professional Conduct 4-8:4(d) which prohibits that kind of behavior.

2. The Defendant, Pinellas County, Florida (hereinafter, the "Defendant") filed the Motion on October 5, 2020.

3. The Motion argues that the Plaintiff's claims against the Defendant should be dismissed for failure to state a claim for which relief can be granted, based upon their assertion that: (A) the Defendant is not able to be sued, as the Sheriff (Defendant Robert A. Gualtieri, hereinafter, the "Sheriff") is "exclusively responsible" for the operation and maintenance of the County Jail; and (B) the Defendant is not a "policymaker" for the operation and maintenance of the County Jail and cannot therefore be held liable under a theory of *respondeat superior*.

## MEMORANDUM OF LAW

I. **STANDARD OF REVIEW.**

   A. **The Defendant has provided no conclusive legal proof that the Defendant is *not* liable under the law.**

First off, the Defendant's arguments are cunning indeed, but not as conclusive as they represent. For example, they argue that, because § 951.062, Fla. Stat. states that sheriffs cease to be liable for actions arising out of the operation and maintenance of the facilities under contract, when a county enters into a contract for the operation and maintenance of county detention facilities, that this leads to an "obvious conclusion" that only the sheriff would have had any such liability prior to the county entering into such a contract. *See*, *Motion*, p. 6, ¶ 1. Notably, that statute does not state that the sheriff is the *only* entity with liability, nor apparently is there any *other* statute saying that directly.

Next, the Defendant points to § 30.52, Fla. Stat. states that, "[t]he independence of sheriff shall be preserved" concerning: (1) the purchase of supplies and equipment; (2) selection of personnel; and (3) firing and setting the salaries of personnel. However, this again does not state

what the Defendant would *like* it to say, as it apparently only mentions those three specific instances, and § 30.53 has never appeared in any case-law

Sheriffs are "county officers" and can be abolished by the county if the duties are transferred to another office. Fla. Const, art. VIII, § 1 (d); Freyre v. Gee, 8:13-CV-2873-T-27TBM, 2017 WL 1017837, at *11 (M.D. Fla. Mar. 15, 2017), aff'd and remanded sub nom. Freyre v. Chronister, 910 F.3d 1371 (11th Cir. 2018). This suggests that the statutory enumeration of certain duties amounts not to an effort by the state to exercise control over the sheriff (at least not for all purposes)—the factor relevant to the arm of the state inquiry—but to ensure that the counties, as political subdivisions of the state, carry out some of the state's local business "in their respective counties." Fla. Stat. § 30.15(1), (2); McMillian v. Monroe County, 520 U.S. 781, 791, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (conceding that the fact that "the sheriff's jurisdiction is limited to the borders of his county" was one "important provision[ ] that cut in favor of the conclusion that sheriffs are county officials"); Abusaid v. Hillsborough County Bd. of County Com'rs, 405 F.3d 1298, 1309 (11th Cir. 2005).

Additionally, in Defendant's Exhibit "B", under § 74-62(b)(2), it states:

> The Pinellas County sheriff shall include costs of medical care, treatment, hospitalization and transportation of arrestees in his annual proposed budget of expenditures for the maintenance and operation of the county jails and shall assume the county's responsibility for medical expenses as provided for in F.S. § 901.35, **and indemnify and defend the county for any actions brought against the county for payment of costs of medical care, treatment, hospitalization and transportation of arrestees**, as provided for in F.S. § 901.25. The costs of such care, treatment, hospitalization and transportation shall be paid out of the sheriff's budget from the general revenue fund of the county.

(emphasis added).

As a result, using the same kind of reasoning employed by the Defendant, how could the Sheriff be expected to "indemnify and defend" the Defendant if the Defendant is always unable to be sued with respect to anything occurring at the County Jail, as the Defendant has argued?

Furthermore, nothing in the Defendant's exhibits or arguments proves that the Sheriff was solely responsible for the medical care provided in the County Jail, which makes up a significant portion of the Plaintiff's claims, and no other Florida statute imposes a statutory duty on sheriffs to provide the medical care within. <u>Race v. Bradford County, Florida</u>, 3:18-CV-153-J-39PDB, 2019 WL 7482235, at *28 (M.D. Fla. Aug. 20, 2019), <u>report and recommendation adopted as modified</u>, 3:18-CV-153-J-39PDB, 2019 WL 7482213 (M.D. Fla. Sept. 26, 2019). Given that many of the actors involved in this case were civilian personnel, rather than deputies of the Sheriff, this distinction is important.

As a result, the Plaintiff argues that the claims against the Defendant should not be dismissed.

> **B. The Defendant is well aware of the needs of civil rights laws and protections of transgender individuals, and as such was in a position to ensure that the Sheriff and County Jail contained policies and procedures that are consistent with Pinellas County's human rights ordinances.**

Given that the Defendant has argued as to the applicability and ability of this Court to take notice of Pinellas County, Florida ordinances, and has cited authority both in Fed. R. Evid. 201(c)(2) and in case-law, the Plaintiff hereby attaches as **Exhibit "A"**, and asks this Court to take judicial notice of, Chapter 70 of the Pinellas County Code of Ordinances (hereinafter, the "Human Rights Ordinances") consisting of the Defendant's ordinances with respect to discrimination and human rights.

Section 70-51 of the Human Rights Ordinances defines "gender" as follows:

> Gender includes but is not limited to sex, pregnancy, childbirth or medical conditions related to pregnancy or childbirth, **gender-related self-identity, self-image, appearance, expression or behavior, whether or not such gender-related characteristics differ from those associated with the individual's assigned sex or physiology at birth**, which gender-related identity can be shown by evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held, part of a person's core identity, or not being asserted for an improper purpose.

**Ex. "A"**, p. 2 (emphasis added). Here, it is clear that the Defendant is describing transgender people.

The Human Rights Ordinances prohibit discrimination against transgender people in employment, housing, and public accommodations. The definition therein of "public accommodations" in § 70-211 is as follows:

> Place of public accommodation means and includes all places included within the meaning of the following: Inns, taverns, roadhouses, hotels, and motels, whether operated for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest; restaurants, eating houses, and any place where food is sold for consumption on the premises; buffets, saloons, barrooms, or any store, park or enclosure where spirits or malt liquors are sold; ice cream parlors, confectioneries, soda fountains, and all stores where ice cream, ice and fruit preparations or their derivatives, or where beverages of any kind, are retailed for consumption on the premises; wholesale and retail stores and establishments dealing with goods or services of any kind; dispensaries, clinics, hospitals; bathhouses, swimming pools; laundries and all other cleaning establishments; barbershops, beauty shops; theaters, motion picture houses, airdromes, roof gardens, music halls, racecourses, skating rinks, amusement and recreation parks, trailer camps, resort camps, fairs, bowling alleys, golf courses, gymnasiums, shooting galleries, billiard and pool parlors; garages; all public conveyances operated on land or water or in the air, as well as the stations and terminals thereof; travel or tour advisory services, agencies or bureaus; and public halls and public elevators of buildings and structures occupied by two or more tenants, or by the owner and one or more tenants.

**Ex. "A"**, p. 24.

Given the extensive list of places of public accommodations, and noting that the Human Rights Ordinances were updated in 2013 to include these transgender protections, it is quite clear that the Defendant was well aware of the importance of prohibiting discrimination against transgender individuals in all areas of Pinellas County, Florida.

Furthermore, the general purposes of the Human Rights Ordinances are to, "[p]rovide for execution within the county of the policies embodied in the Federal Civil Rights Act of 1964, as amended", and to "[s]ecure for all individuals within the county the freedom from discrimination because of race, color, religion, national origin, gender, sexual orientation, age, marital status, or disability in connection with employment, and thereby to promote the interests, rights and privileges of individuals within the county". § 70-52(a)(1)-(2); **Ex. "A"**, p. 3.

Furthermore, the Human Rights Ordinances "shall be liberally construed to preserve the public safety, health and general welfare, and to further the general purposes stated herein" and the enforcement of the Human Rights Ordinances "may be delegated by interlocal agreement to other units of local government or to nonprofit corporations". § 70-52(b)-(c); **Ex. "A"**, p. 3.

As a result, it is simply inconceivable that the Defendant should permit the Sheriff to run the County Jail in a manner that is not consistent with at the very *least*, the same level of care as a bowling alley or retail establishment. Furthermore, given that "dispensaries, clinics, [and] hospitals" are covered under the requirements of the Human Rights Ordinances, at the very least, this Court should permit this case to go forward such that discovery can be conducted to determine whether the medical and psychiatric care and/or facilities where the Plaintiff was treated during her confinement at the County Jail would be covered under the auspices of the Human Rights Ordinances.

### C. The Defendant's failure to ensure that the Sheriff and County Jail and its employees and agents were operating consistently with the Pinellas County Human Rights Ordinances is a legitimate basis for relief under <u>Monell</u>.

In <u>Monell v. Department of Social Services</u>, the Supreme Court held that local governing bodies (including when sued through local government officials in their official capacities) can be sued "directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 & n.55 (1978).

> [A]lthough the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.

<u>Id.</u>, at 690–91.

There are "several different ways of establishing" liability of a local government body under § 1983. <u>Hoefling v. City of Miami</u>, 811 F.3d 1271, 1279 (11th Cir. 2016). A local government body "can be liable for an official policy enacted by its legislative body (e.g., an ordinance or resolution passed by a city council)." <u>Id.</u> A local government body can be liable "if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure." <u>Id.</u> And a local government body "can be held liable on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." <u>Id.</u> (internal quotation marks and quoted authority omitted).

There are also "limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." <u>City of Canton v. Harris</u>, 489 U.S. 378, 387 (1989). The

inadequacy of training can serve as the basis for § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [local government agent] come into contact." Id., at 388. A failure-to-supervise claim and a failure-to-promulgate-policy claim are treated like a failure-to-train claim. See, e.g., Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011); Long v. Cty. of Los Angeles, 442 F.3d 1178, 1189 (9th Cir. 2006).

Nevertheless, in Connick v. Thompson, the Supreme Court emphasized that deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." 563 U.S. 51, 61 (2011) (internal quotation marks and quoted authority omitted). The Court explained that where "policymakers are on actual or constructive notice that a particular omission in their training program causes ... employees to violate citizens' constitutional rights, the [local government body] may be deemed deliberately indifferent if the policymakers choose to retain that program." Id. The Court explained the local government body's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the [body] itself to violate the Constitution." Id., at 61–62 (internal quotation marks and quoted authority omitted).

The Court added, "[I]n a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference." Id. (internal quotation marks and quoted authority omitted). The Court "posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." Id. (*citing* City of Canton, 489 U.S. at 390 n. 10). The Court explained, "Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, ... a city's decision not to train the officers about

constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights." Id., at 63–64 (internal quotation marks and quoted authority omitted).

In certain circumstances, "a local government's decision **not** to train certain employees about their legal duty to avoid violating citizens' rights" may rise to the level of an official government policy for purposes of § 1983. Id., at 61 (emphasis added). Here, the failure of the Defendant to ensure that the Sheriff and County Jail were operating under similar understandings of basic civil and human rights cannot be ignored.

It is simply inconceivable that the Defendant, knowing and recognizing the importance of transgender rights since at least 2013 when the Human Rights Ordinances were enacted, would not know that the basic human rights afforded to all citizens of Pinellas County were being trampled upon in the County Jail, and that the employees of the County Jail were so utterly untrained (or mis-trained) in how to treat transgender inmates and detainees that the behavior described in the Plaintiff's Complaint could occur. As such, the Defendant was aware of the deficiencies, and failed to ensure that the Sheriff appropriately discharged his duties, and at best, failed to ensure that the County Jail was being run properly, or at worst was complicit in the denial of basic human rights in the County Jail. In any case, this is a plausible line of reasoning for liability, and this Court should not dismiss the counts against the Defendant at this early stage.

## **CONCLUSION**

In short, the Defendant has not proved that it is entitled to dismissal, and this Court should not grant the Defendant's requested relief, particularly at such an early stage of these proceedings. In the alternative, and "giving recognition to the well established principle that liberality in amendments to pleadings are to be favored by the courts", the Plaintiff would request that this

Court permit the filing of an amended complaint. Baugher v. Alachua County, 305 So. 2d 838, 839–40 (Fla. 1st DCA 1975).

WHEREFORE, the Plaintiff respectfully requests that this Court deny Defendant Pinellas County's Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. 33), and for any and all other relief as this Court deems in the interests of justice.

Respectfully Submitted,

_____
ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
904.602.9400 (Office)
904.299.5400 (Fax)
reringer@lentolawgroup.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 19, 2020, a copy of the foregoing has been furnished by CM/ECF to: Kelly L. Vicari, Esq., Pinellas County Attorney's Office, 315 Court Street, Sixth Floor, Clearwater, Florida 33756, kvicari@pinellascounty.org, eservice@pinellascounty.org, and to Paul G. Rozelle, Esq., Pinellas County Sheriff's Office, 10750 Ulmerton Road, Largo, FL 33778, prozelle@pcsonet.com, amarcott1@pcsonet.com.

Respectfully Submitted,

_____
ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
*Attorney for Plaintiff*