UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO<br><br>Plaintiff,<br><br>v.<br><br>ROBERT A. GUALTIERI, in his official capacity as Sheriff of Pinellas County, PINELLAS COUNTY, FLORIDA, et al.,<br><br>Defendants. | Case No.: 8:20-cv-02005-TPB-AEP |

**PLAINTIFF'S RESPONSE TO MOTION TO DISMISS OF SGT. JENNIFER VIENO, SGT. JASON FRANJESEVIC, AND CPL. RICHARD MERRITT AND INCORPORATED MEMORANDUM OF LAW**

COMES NOW the Plaintiff, CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO (hereinafter, "Plaintiff" or "Karla"), by and through her undersigned attorney, and hereby responds in opposition to the Defendants' Motion to Dismiss of Sgt. Jennifer Vieno, Sgt. Jason Franjesevic, and Cpl. Richard Merritt (hereinafter, the "Motion to Dismiss") and states as follows:

1. This is a federal civil rights case pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution for the Defendants' individual and collective personal, malicious, and unlawful violations under color of state law of Plaintiff's individual rights.

2. The Defendants, Sgt. Jennifer Vieno (hereinafter, "Vieno"), Sgt. Jason Franjesevic (hereinafter, "Franjesevic"), and Cpl. Richard Merritt (hereinafter, "Merritt") (hereinafter collectively, the "Defendants") filed the Motion to Dismiss on October 13, 2020.

3.  The Motion to Dismiss argues that the Plaintiff's claims against the Defendants should be dismissed "because the amended complaint is prolix and a shotgun pleading in violation of Fed. R. Civ. P. 8(a)(2) & 8(d)(1)", and because they allege that they are entitled to qualified immunity.[1]

4.  Given that the Motion to Dismiss incorporates arguments from other Defendants' motions to dismiss, the Plaintiff's responses against those incorporated arguments are recreated herein so as not to require this Court to switch back and forth between various motions.

## MEMORANDUM OF LAW

### I.  STANDARD OF REVIEW.

**A. Motions for Dismiss for Failure to State a Claim.**

The threshold for surviving a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is a low one. <u>Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al.</u>, 711 F.2d 989, 995 (11th Cir.1983). A plaintiff must plead only enough facts to state a claim to relief that is plausible on its face. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S.Ct. 1955, 1968–69, 167 L.Ed.2d 929 (2007) (abrogating the "no set of facts" standard for evaluating a motion to dismiss established in <u>Conley v. Gibson</u>, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. <u>Id.</u> (*citing* <u>Sanjuan v. American Board of Psychiatry and Neurology, Inc.</u>, 40 F.3d 247, 251 (7th Cir.1994)). In evaluating the sufficiency of a complaint in light of a motion to dismiss, the well pleaded facts must be

---

[1] The Motion to Dismiss also states that Defendants "join in, adopt, and incorporate" the arguments set forth in the motions to dismiss filed by Defendants Deputy Cox, Deputy Moses, Deputy Berje, Col. Danzig, and Capt. Napier, (pp. 3, ¶ 2 – 4, ¶ 2) and as a result, the arguments against the other issues raised in the response to those motions are included herein.

accepted as true and construed in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994–95.

Because of the liberal pleading requirements of the Federal Rules, rarely will a motion to dismiss for failure to state a claim be granted. Quality Foods, 711 F.2d at 995. Indeed, such a motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (*quoting* Conley, 355 U.S. at 45–46, 78 S.Ct. at 102; *accord* McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980); Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 602 (5th Cir.1981); Quinonez v. Nat'l Ass'n of Sec. Dealers, Inc., 540 F.2d 824, 826-827 (5th Cir. 1976).

### B.  Qualified Immunity.

The Defendants have moved to dismiss based upon the affirmative defense of qualified immunity. The Supreme Court of the United States has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); *see also,* Lumley v. City of Dade City, 327 F.3d 1186, 1193-94 (11th Cir. 2003).

The test for whether a governmental defendant is entitled to qualified immunity from liability in his individual capacity involves a two-step analysis. Hope v. Pelzer, 536 U.S. 730 (2002). Before applying the test, a government official first must demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (*quoting* Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir. 1983) ).

If the defendant satisfies this burden, the first prong of the test requires the plaintiff to show either that the official's actions "violated clearly established constitutional law" or a federal statute. Id.; Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id., at 201. Furthermore, "if a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.' " Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

##   II.   ARGUMENT.

### A. The First Amended Complaint is not "prolix", and it is certainly not subject to dismissal based upon Rule 8.

Secondly, it should be noted that the Defendant's argument regarding the alleged "prolix" nature of the First Amended Complaint do not comport with his arguments regarding a "shotgun pleading". One is left wondering how a detailed, allegedly "prolix" pleading could simultaneously be too specific and not specific enough, and given the nature of the Defendants' arguments, it is clear that were the First Amended Complaint shorter, they would be arguing that it did not set forth sufficient facts.

The First Amended Complaint, at 51 pages and 258 paragraphs, is simply a well-researched and detailed explanation of the various issues and complex concepts described therein, which is especially important given the many defendants. Further, the introductory factual allegations are only 19 pages and 103 paragraphs. The rest of the First Amended Complaint consists of Counts I to VII.

Compared to other pleadings deemed "prolix" by this Court, the First Amended Complaint does not even come close. For example, this Court found that a complaint consisting of 134 pages and 566 paragraphs long, where the "recitation of the various counts does not begin until page 126,

paragraph 526", such was a good example of a "prolix" claim. Lawrie v. The Ginn Companies, LLC, 309-CV-446-J-32JBT, 2010 WL 3746725, at *3 (M.D. Fla. Sept. 21, 2010)

Another example, in Al-Rayes v. Willingham, 3:15-CV-107-J-34JBT, 2016 WL 6080826, at *3 (M.D. Fla. Aug. 15, 2016), report and recommendation adopted, 3:15-CV-107-J-34JBT, 2016 WL 6071636 (M.D. Fla. Oct. 17, 2016), the complaint was deemed "prolix" by this Court where it had 66 pages *but* the first 41 pages and 202 paragraphs preceded any of the counts.

The Southern District found that a complaint spanning 142 pages was "prolix". Lawrie v. Ginn Dev. Co., LLC, 3:09-CV-446-J-32JBT, 2014 WL 4788067, at *3 (M.D. Fla. Sept. 19, 2014), aff'd, 656 Fed. Appx. 464 (11th Cir. 2016). The same court found that a complaint consisting of 507 pages (inclusive of exhibits), 341 paragraphs, and 7 counts was also "prolix". Shaprio v. Unum Life Ins. Co. of Am., 17-CV-23992-UU, 2017 WL 10379581, at *1 (S.D. Fla. Nov. 29, 2017).

To the contrary, because of the nature of this suit, it was important to address the medical issues therein, particularly where issues of transgender health and terminology might not be well known to the reader, as well as by laying out as many of the facts of the specific incidents in the County Jail that led to the Counts as could be stated to explain how all of the different Defendants contributed.

### B. The First Amended Complaint is not an impermissible "shotgun pleading".

This allegation is simply untrue, as the Defendants argue that the Plaintiff has re-alleged all preceding counts and is "vague" and what-not. In fact, one of the chief differences between the initial Complaint and the First Amended Complaint is that the Plaintiff corrected all of the re-allegations in each count, such that they only re-allege the introductory facts and explanations up to paragraph 103. Furthermore, for the Defendants to allege that the First Amended Complaint is

"vague" and "conclusory", it is quite interesting that this section of the Motion to Dismiss is, well…vague and conclusory.

### C. The Defendants are arguing out of both sides of their mouths.

First off, it should be noted that the Defendants' argument here regarding <u>Keohane v. Florida Dep't of Corr. Sec'y</u>, 952 F.3d 1257, 1275, 1279 (11th Cir. 2020) (hereinafter, <u>Keohane II</u>), is interesting, considering that in Deputy Steve Cox, Jr.'s Motion to Dismiss (the "entirety" of which is incorporated into the Defendants' Motion to Dismiss) states that, "Because amendment would be futile — Bello cannot change the state of the law in December 2019 — dismissal with prejudice on a finding that Deputy Cox is entitled to qualified immunity is warranted." *Motion to Dismiss Amended Complaint of Deputy Cox* [Dkt. 35], p. 10, ¶ 1.

The reasoning for why this is interesting is because the law in place during the entirety of the time that the Plaintiff was in the County Jail was the Southern District's decision in <u>Keohane v. Jones</u> (hereinafter, <u>Keohane I</u>), which ordered that the Florida Department of Corrections:

> permit Ms. Keohane access to the same undergarments, hair-length policy, and makeup items available for inmates housed in Defendant's female facilities so that she can socially transition to treat her gender dysphoria.

328 F. Supp. 3d 1288, 1318 (N.D. Fla. 2018), <u>vacated sub nom.</u> <u>Keohane v. Florida Dep't of Corr. Sec'y</u>, 952 F.3d 1257 (11th Cir. 2020).

So if this Court were to proceed on the perspective that the Defendants are not liable because of "the state of the law in December 2019", well, **the state of the law at that time was that transgender women <u>must</u> be permitted to access the same undergarments, hair-length policy, and makeup items available for non-transgender women in jail facilities**.

### D. The Defendants either completely misunderstand, or have deliberately misstated, the holding in <u>Keohane II</u>.

The holding in <u>Keohane II</u> did not state that the undergarments, hair, and makeup issue (hereinafter, the "social transitioning issue") could lawfully be denied to transgender women. The court found that, because there was at the time a disagreement among the medical staff as to whether the social transitioning issue was medically necessary, their denial of that inmate's ability was "mere negligence", and did not rise to the level of the "deliberate indifference" needed to state a claim for Eighth Amendment cruel and unusual punishment.

In fact, a very telling aspect of the <u>Keohane II</u> decision states as follows:

> The FDC has given Keohane some, but not all, of what she wants—although it has denied her social-transitioning requests (at least as they pertain to clothing and grooming), it has provided mental-health counseling, hormone therapy, the use of female pronouns, safer housing accommodations, and private shower facilities. And like the prison officials in <u>Kosilek</u>, the FDC has struck that balance both because Keohane's treatment team has determined that her current regimen is sufficient to treat her gender dysphoria and because it has rationally concluded that her social-transitioning requests—to dress and groom herself as a woman—would present significant security concerns in an all-male prison.

<u>Keohane II</u>, 952 F.3d at 1277. It is all there in black and white: the reason that the Eleventh Circuit found that the social transitioning issue was only "mere negligence" was because there was a "current regimen" that was sufficient to treat the inmate's gender dysphoria. <u>Id.</u>

Here, to the contrary, **the Defendants refused to treat the Plaintiff's gender dysphoria in <u>any</u> way, and even refused to stop calling her "Sir" and "Mister" and deliberately refusing to even acknowledge any aspect of her gender identity whatsoever.** While the defendants in <u>Keohane II</u> might have successfully argued that by treating some, but not all, of that inmate's serious medical needs, they had only committed "mere negligence" with respect to the social transitioning issues, that is not in any way, shape, or form applicable to the instant case, where the Defendants were literally taunting and mocking the Plaintiff's serious medical needs.

To compare to the serious medical need of an injury that is bleeding, the decision in Keohane II is akin to the court saying that, because a medic has already put a bandage on the wound, it was only "mere negligence" for that medic to fail to *also* give the injured person an antibiotic to deal with infection, as the medic was clearly attempting to care for the injured person. To read Keohane II the way that the Defendants have argued would be to say that, if the medic failed to put a bandage on the wound, it could also ignore the antibiotic treatment. Again, the Defendant's interpretation of the holding in Keohane II defies logic and common sense.

> **E. There is no debate that gender dysphoria is a "serious medical need" requiring treatment, and that these Defendants participated in the refusal to medically treat the Plaintiff.**

With respect to the subject of serious medical needs, here is what the Eleventh Circuit stated in Keohane v. Florida Dep't of Corr. Sec'y, with respect to the serious medical need component:

> Here, as already noted, there's no debate about the objective component. **The [Florida Department of Corrections] admits—and the parties thus agree—that Keohane's gender dysphoria constitutes a "serious medical need."**

952 F.3d 1257, 1266 (11th Cir. 2020) (hereinafter, Keohane II) (emphasis added).

If the Florida Department of Corrections recognizes that gender dysphoria is a serious medical need, and they *also* agreed that it was a serious medical need even back in 2018 in Keohane v. Jones, 328 F. Supp. 3d 1288, 1318 (N.D. Fla. 2018), vacated sub nom. Keohane v. Florida Dep't of Corr. Sec'y, 952 F.3d 1257 (11th Cir. 2020) (hereinafter, Keohane I), why are the Defendants here trying to argue that they had no duty to do *anything* to treat this serious medical need?

> **F. The Defendants' case-law regarding pronouns is neither binding in this district, nor supported by the Florida Bar.**

First, the Defendants argue that, "[n]o court has ever found or held that misgendering someone is unconstitutional", and cites to the non-precedential decision in United States v. Varner, 948 F.3d 250, 254-55 (5th Cir. 2020) ("[N]o authority supports the proposition that we may require litigants, judges, court personnel, or anyone else to refer to gender dysphoric litigants with pronouns matching their subjective gender identity."). Not only does this have very little to do with the Defendant's complete failure to address the Plaintiff's gender dysphoria in *any* way, but frankly, the Florida Bar, in Florida Rule of Professional Conduct 4-8:4(d), considers such conduct to be a professional violation.[2]

Furthermore, the Varner case did not involve either Eighth Amendment or Fourteenth Amendment issues, anything to do with "serious medical need", or anything else relevant whatsoever to this case. The Defendants merely plucked their quotation from a discussion of courtroom procedure and planted them into his Motion to Dismiss, in the hopes that this Court would overlook the deliberate misinterpretation of the nature of that court's commentary.

Essentially, the Varner decision is completely irrelevant here and brings no arguments of value to this case.

### G. The Defendant's other citations are also distinguishable and inapplicable.

For example, it should be noted that the unpublished case cited by the Defendants was later affirmed, but *criticized*, by the Eleventh Circuit, which stated that, "[t]he district court dismissed the claims against Wilkins and Montaldi in their individual capacities because it found that Hood failed to allege any personal refusals to treat gender dysphoria", and that the dismissal with prejudice ruling was in error, thus remanding to the district court for the plaintiff to amend her

---

[2] Notably, the Undersigned affirms to the fact that she received an ethics opinion from the Florida Bar Ethics Hotline in mid-2019, prior to the events in this case, confirming that attorneys commit an ethical violation by intentionally misgendering a transgender litigant or witness.

complaint. Hood v. Dep't of Children & Families, 700 Fed. Appx. 988, 990 (11th Cir. 2017). In Hood, one of the main issues was that when filed, the institution did not have *any* treatment program for transgender inmates, but it had later enacted one, making the claims as originally pled "moot". Here, the Defendants argue that they are under no obligation to do *anything* for transgender prisoners, not even the basic human decency of referring to the Plaintiff by her proper female pronouns (she/her/hers), **which would have cost the County Jail absolutely *nothing***.

Furthermore, the Defendants' citation to a 1997 Sixth Circuit case is patently *ridiculous* and insulting, as in 1997, most people did not even know what a transgender person was, and obviously, the state of transgender civil rights has changed immensely since then, not to mention the fact that such a decision carries far less weight than the Florida district court cases that he omitted. In fact, the decision in Edmo v. Corizon, Inc., 935 F.3d 757 (9th Cir. 2019), cert. denied sub nom. ID DOC, et al. v. Edmo, Adree, 19-1280, 2020 WL 6037411 (U.S. Oct. 13, 2020), would be a much more applicable ruling to cite with respect to persuasive authority (transgender prisoner must be afforded gender confirmation surgery).

### H. The Fourteenth Amendment claims are well pleaded and backed up by sound case-law.

First off, it should be noted that the same Defendants who complained of the First Amended Complaint being "prolix" is now arguing that the allegations against the Defendants are not sufficiently detailed enough to describe their specific actions and involvement.

While the *specifics* of the Defendants' individual participation in the specific allegations pleaded will become clearer through discovery, it is not in dispute that all three Defendants are specified in the report where they refused to treat the Plaintiff's serious chest pains resulting from the withdrawal symptoms caused by the failure to give the aforementioned medication. See, *DDC Incident Detail Report*, attached to the First Amended Complaint as **Exhibit "G"**, 055.

In fact, this is also one of the places in the jail records where the comments (here authored by Defendant Franjesevic) mock the Plaintiff by referring to "alleged 'chest pains'" and repeatedly describing her with he/him/his pronouns:

> I was notified and responded. I agree with the actions taken by staff as outlined in this report. Inmate Nogueda was medically evaluated for **his alleged, "chest pains"** by Nurse Hilery and cleared to remain in his current housing assignment. Kiosk Case Message is attached to this report. Acting Shift Commander, Sergeant Vieno was notified.

Id. (emphasis added). In other words, **all three Defendants** were involved in the denial of medical care for the Plaintiff's gender dysphoria, and Vieno, Franjesevic's, and Merritt[3]'s approval and ratification of Deputy Moses's actions prove it. In addition, they all participated in the denial medical care for the Plaintiff's withdrawal symptoms caused by the refusal of any Defendant to provide her hormone treatment therapy medications. As noted previously, it is not in dispute that gender dysphoria is a serious medical need, and the Defendants' actions were not only a denial of care, but a compounding of the negative effects.

Notably, in that incident, the Plaintiff sent a message to the housing deputy, stating:

> I have not recived hrt[4]. i signed to se arnp nurse on friday. iv been off spironlactone,finersteride, and can feel chest pains. hormones unbalalanced. the lack of feedback about when ill see the arnp.

**Ex. "G"** to the First Amended Complaint, 056.

Franjesevic's heartless response was to mark the status of the request as "Closed, Unfounded" and enter the following message:

> Inmate Nogueda was medically evaluated for his "Chest Pains" on 12/02/2019 at 1645 hours. Per Nurse Hillary, the inmate was cleared to remain in current housing.

---

[3] Merritt specifically stated: "I agree with the authored report generated by Deputy Moses and the actions taken." **Ex. "H"**, 059
[4] "HRT" refers to the Hormone Replacement Therapy that is used to treat gender dysphoria, a serious medical need.

**Ex. "G"** to the First Amended Complaint, 056.

The Plaintiff would probably have received better care if she'd been on withdrawal from heroin or some other narcotic, as it is far more likely that they would have considered those withdrawal symptoms to be serious, whereas here…well, Karla was just a transgender woman who they could not even be bothered to call "she", "her", or "Karla". This was dehumanization of the highest order at work.

It is also not in dispute that **all three Defendants** were involved in the December 6, 2019 Incident where Merritt stripped and humiliated the Plaintiff for her attempts at self-care for her serious medical need of gender dysphoria, and where Merritt then "confiscated" her undergarments. See, *DDCI Incident Detail Report*, attached to the First Amended Complaint as **Exhibit "H"**, 059. In addition, Franjesevic stated, "I was notified and agree with the actions taken by staff as outlined in this report." Id.

Furthermore, the time for the Defendants to argue about the Supreme Court's seminal decision in Bostock v. Clayton County, Georgia, 140 S. Ct. 1731 (2020), and whether it applies to the Fourteenth Amendment and disparate impact claims is likely not yet upon the parties at this initial stage. However, it should be noted that the Eleventh Circuit recently upheld this Court's decision in Adams by & through Kasper v. Sch. Bd. of St. Johns County, Florida, 318 F. Supp. 3d 1293 (M.D. Fla. 2018), aff'd sub nom. Adams by & through Kasper v. Sch. Bd. of St. Johns County, 968 F.3d 1286 (11th Cir. 2020), whereupon the Eleventh Circuit discussed the applicability of Bostock outside of the realm of Title VII, stating, "Bostock confirmed that workplace discrimination against transgender people is contrary to law. Neither should this discrimination be tolerated in schools." Id., at 1310. The Eleventh Circuit also affirmed that the violations against the plaintiff in that suit were violations of the Fourteenth Amendment. Id.

Furthermore, while the Eleventh Circuit in <u>Keohane II</u> determined that they could no longer address a policy as it had been rescinded as moot, they affirmed that gender dysphoria (the psychological term for being transgender) clearly constitutes a "serious medical need" and stated:

> It seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of "deliberate indifference"—anti-medicine, if you will.

952 F.3d at 1266–67.

In addition, the court went on to state that:

> **Unsurprisingly to us, other courts considering similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment.** *See, e.g.*, <u>Fields v. Smith</u>, 653 F.3d 550, 559 (7th Cir. 2011); *see also* <u>Hicklin v. Precynthe</u>, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018); <u>Soneeya v. Spencer</u>, 851 F. Supp. 2d 228, 247 (D. Mass. 2012).

<u>Id.</u>, at 1267 (emphasis added). Notably, the case under review by the court in that case, <u>Keohane I</u>, had found a more expansive view of the application of the Eighth Amendment prohibition of cruel and unusual punishment with relation to social transitioning items than the Eleventh Circuit would uphold, but that decision was in place from August 22, 2018 to March 11, 2020, and all of the conduct in this case took place during that time period, so any of the Defendants' claims that they were unaware of the established constitutional rights of the Plaintiff fail as a matter of law. Further, unlike in <u>Keohane II</u>, this issue is not "moot".

In addition, if it is clearly a violation of the Fourteenth Amendment to not allow a male transgender student to use a bathroom consistent with his gender, then surely it is a violation of the Fourteenth Amendment to deny the Plaintiff her medical care to treat her serious medical need, to humiliate and strip her of her underwear, or to fail to address the physical and psychological

damage caused by the unconstitutional denial of any medical treatment for her gender dysphoria, which was going completely untreated due to the Defendants completely refusing to address any aspect of this serious medical need.

> **I. The Fourteenth Amendment claims are solidly pleaded, and any references to the Eighth Amendment that are contained in the First Amended Complaint are solely in reference to the fact that the standards for cruel and unusual punishment claims are identical.**

Jail guards, deputies, correctional officers, and the like are, "of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment". Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). However, technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like the Plaintiff. Goebert, 510 F.3d at 1326; Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1268 (11th Cir.2005). However, **"the standards under the Fourteenth Amendment are identical to those under the Eighth"**. Goebert, 510 F.3d at 1326 (emphasis added); Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir.2005).

Any remnants of references to the Eighth Amendment appearing in the First Amended Complaint that are outside of the applicability of the standards being identical are unintentional, and it is clear that the Plaintiff therein is not alleging counts based upon the Eighth Amendment, but rather, the Fourteenth Amendment.

> **J. The Defendants are also liable under a supervisory liability theory.**

"Supervisory officials cannot be held vicariously liable under section 1983 for the actions of their subordinates unless the supervisor 'personally participates in the alleged unconstitutional conduct' or 'there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.' " Smith v. Deal, No. 18-13424, 2019 WL 378568, at *2 (11th

Cir. Jan. 30, 2019) (*quoting* Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) ). "A causal connection can be established when facts support an inference that the supervisor directed the subordinates to act unlawfully **or knew that the subordinates would act unlawfully and failed to stop them from doing so**." Smith v. LePage, 834 F.3d 1285, 1298 (11th Cir. 2016) (emphasis added) (quotations and citation omitted). A causal connection also " 'can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.' " Knight through Kerr v. Miami-Dade Cty., 856 F.3d 795, 820 (11th Cir. 2017) (*quoting* Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) ). "But one incident will not suffice; rather, [t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Id. (quotations and citation omitted). Manago v. Glass, 3:16-CV-1508-J-32JBT, 2019 WL 1014440, at *11 (M.D. Fla. Mar. 4, 2019).

A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003), or that a supervisor's "custom or policy ... resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir.1991); Powers v. Jones, 3:15-CV-595-J-34PDB, 2015 WL 2402363, at *2 (M.D. Fla. May 20, 2015).

Here, the Plaintiff has shown that the Defendants approved multiple reports regarding the psychological abuse effected upon the Plaintiff, the denial of medical care to address the Plaintiff's serious medical needs or to treat the withdrawal symptoms from their failure to provide her those medications.

Rather than do anything to address this abuse, the Defendants "approved" the reports, and in some cases were actively involved in the behavior. Because there are more than one report, and the incidents consist of actions which are clearly the "norm" and policy of the County Jail, the Defendants were on notice that the other subordinate Defendants were continuing to act unlawfully and failed to do anything about it. *See also,* N.R. by Ragan v. Sch. Bd. of Okaloosa County, Florida, 418 F. Supp. 3d 957, 983 (N.D. Fla. 2019). In addition, the Plaintiff, on multiple occasions, complained and/or lodged grievances about the unconstitutional conditions of her confinement and the unlawful actions of the Defendants, as is presented in detail in the First Amended Complaint.

Finally, this is the preliminary Rule 12(b)(6) dismissal stage, not the summary judgment stage, and as such, the Plaintiff should have the opportunity to conduct discovery and find out more about the official policies of the Defendants and their hands in failing to stop the other Defendants from conducting these unlawful actions, and by approving, condoning, and ratifying the unlawful actions on multiple occasions.

While the Defendants surely appear to think that the Plaintiff's claims are 'trivial', such does more to prove the Plaintiff's claims that the Defendants are liable. As shown herein, these constitutional deprivations have certainly been considered significant in cases before the Eleventh Circuit and other Florida federal courts. As such, the Defendants' Motion to Dismiss must be denied.

## **CONCLUSION**

In short, the Defendants have *not* proved that they are entitled to dismissal, and this Court should not grant the Defendants' requested relief, particularly at such an early stage of these proceedings. In the alternative, and "giving recognition to the well established principle that liberality in amendments to pleadings are to be favored by the courts", the Plaintiff would request

that this Court permit the filing of an amended complaint. Baugher v. Alachua County, 305 So. 2d 838, 839–40 (Fla. 1st DCA 1975).

WHEREFORE, the Plaintiff respectfully requests that this Court deny the Defendants' Motion to Dismiss of Sgt. Jennifer Vieno, Sgt. Jason Franjesevic, and Cpl. Richard Merritt, and for any and all other relief as this Court deems in the interests of justice.

Respectfully Submitted,

_____
ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
904.602.9400 (Office)
904.299.5400 (Fax)
reringer@lentolawgroup.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 27, 2020, a copy of the foregoing has been furnished by CM/ECF to: Kelly L. Vicari, Esq., Pinellas County Attorney's Office, 315 Court Street, Sixth Floor, Clearwater, Florida 33756, kvicari@pinellascounty.org, eservice@pinellascounty.org, and to Paul G. Rozelle, Esq., Pinellas County Sheriff's Office, 10750 Ulmerton Road, Largo, FL 33778, prozelle@pcsonet.com, amarcott1@pcsonet.com.

Respectfully Submitted,

_____
ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
*Attorney for Plaintiff*