UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO <br><br> Plaintiff, <br><br> v. <br><br> ROBERT A. GUALTIERI, in his official capacity as Sheriff of Pinellas County, PINELLAS COUNTY, FLORIDA, et al., <br><br> Defendants. | Case No.: 8:20-cv-02005-TPB-AEP |

**PLAINTIFF'S RESPONSE TO MOTION TO DISMISS OF SHERIFF GUALTIERI AND INCORPORATED MEMORANDUM OF LAW**

COMES NOW the Plaintiff, CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO (hereinafter, "Plaintiff" or "Karla"), by and through her undersigned attorney, and hereby responds in opposition to the Defendants' Motion to Dismiss of Sheriff Gualtieri [Dkt. 43] (hereinafter, the "Motion to Dismiss") and states as follows:

### INTRODUCTION

1. This is a federal civil rights case pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution for the Defendants' individual and collective personal, malicious, and unlawful violations under color of state law of Plaintiff's individual rights.

2. The Defendant, Sheriff Robert A. Gualtieri (hereinafter, the "Defendant", "Gualtieri" or "Sheriff Gualtieri") filed the Motion to Dismiss on October 13, 2020.

3. The Motion to Dismiss argues that the Plaintiff's claims should be dismissed

"because the amended complaint is prolix and a shotgun pleading in violation of Fed. R. Civ. P. 8(a)(2) & 8(d)(1)", and because they allege that they are entitled to qualified immunity.[1]

4. Given that the Motion to Dismiss incorporates arguments from other Defendants' motions to dismiss, the Plaintiff's responses against those incorporated arguments are recreated herein so as not to require this Court to switch back and forth between various motions.

## POLICIES AND PROCEDURES

5. Notably, the Defendant argues that the First Amended Complaint does not list the specific policies, practices, or customs concerning the provision of hormone replacement therapy, housing, or bathroom use with respect to transgender inmates.

6. However, on information and belief, at least at the time of the incidents described in the First Amended Complaint, these policies and practices were not in any *written* form, leading to the de-facto policies, practices, and customs of the Pinellas County Sheriff's Office (hereinafter, "PCSO") being that transgender inmates were treated according to their sex assigned at birth, putting transgender women in jail with men, and transgender men in jail with women.

7. The Defendant himself admitted publicly that no such policies are *written down*, as is discussed in the section herein titled "Sheriff Gualtieri's Admission of Liability", wherein he also described the policies consistently with the allegations in the First Amended Complaint.

8. At the very least, if there *are* any *written* policies or procedures of PCSO with respect to transgender inmates or detainees, they will be subject to discovery in this case.

## PRELIMINARY ISSUES

9. First off, the Motion to Dismiss, like nearly every other such motion filed by PSCO

---

[1] The Motion to Dismiss also states that Defendants "join in, adopt, and incorporate" the arguments set forth in the motions to dismiss filed by Defendants Deputy Cox, Deputy Moses, Deputy Berje, Col. Danzig, and Capt. Napier, (pp. 3, ¶ 2 – 4, ¶ 2) and as a result, the arguments against the other issues raised in the response to those motions are included herein.

attorney Paul G. Rozelle, Esq. (hereinafter, "Rozelle"), is intentionally flippant and insulting towards the Plaintiff's claims and gender identity.

10. One especially egregious example of this behavior is Paragraph 2 of the Motion to Dismiss, wherein Rozelle attempts to belittle the Plaintiff and her arguments through deliberately offensive terminology designed to offend:

> The gravamen of Bello's official capacity claims against the Sheriff is her belief that the Constitution requires that (1) jail inmates must be housed according to their gender identity — **i.e., a male inmate who identifies as a woman** must be housed with cisgender women; (2) transgender inmates must be permitted to access "restrooms and other single-sex facilities consistent with their gender identity;" and (3) transgender jail inmates must be provided with "medical care consistent with their gender identity."

*Motion to Dismiss* [Dkt. 43], p. 2, ¶ 2 (emphasis added).

11. In addition to the deliberate characterization of transgender women as "male" above, he does it again in Paragraph 5:

> Bello also admits that despite identifying and living as a female, her birth certificate and other identification documents identify her as "male," id. ¶¶ 115, 193 & 216, which is also how she is identified on the host of traffic tickets that resulted in her incarceration when she failed to pay them and failed to show up to court when ordered to do so, Dkt. 33-1, at 2, 4 & 6, and on the arrest affidavit, id. at 9, that ultimately landed her in jail.

*Motion to Dismiss* [Dkt. 43], pp. 2-3, ¶ 5 (emphasis added).

12. The above also shows another of Rozelle's tactics, to paint the victim, the Plaintiff, as some kind of career criminal and exaggerate the tickets that landed her in the County Jail.

13. To the contrary, the tickets that got her into trouble were two "red light camera" tickets, which were attached to the First Amended Complaint as **Exhibits "A" & "B"**.

14. The Plaintiff has a cleaner criminal record than most people, as apart from these tickets and the resulting suspension of her license that caused her final ticket are the entirety of her "record". The suspension ticket was attached to the First Amended Complaint as **Exhibit "C"**,

and the arresting officer stated:

> DEF WAS STOPPED FOR PASSENGER SIDE TAIL LIGHT NOT WORKING. DEF'S LICENSE WAS SUSPENDED ON 8/19/19 FOR FAILURE TO PAY TRAFFIC FINE. **DEF HAD A GOOD ATTITUDE AND WAS RESPECTFUL.**

Id. (emphasis added).

15. This is especially egregious for multiple reasons, including that the behavior **on the part of the Defendants in this action** has been held to be violations of the Eighth Amendment's prohibition on cruel and unusual punishment, as described later herein.

16. An example of the insulting commentary in the Motion to Dismiss is the characterization of the Plaintiff's allegations as claiming, "a constitutional right to wear makeup in jail." *Motion to Dismiss* [Dkt. 43], p. 2, ¶ 1.

## SHERIFF GUALTIERI'S ADMISSION OF LIABILITY

17. One issue that Rozelle, in all his prior motions to dismiss which claim that none of the Defendants did anything wrong, appears to deliberately contradict Sheriff Gualtieri himself.

18. In fact, when Gualtieri was asked by the media about the Plaintiff's treatment in the County Jail, he made multiple public statements, as memorialized in the Tampa Bay Times:

> Pinellas Sheriff Bob Gualtieri said his jail staff does the best it can to address the needs of inmates, but he acknowledged they at times mistreated Bello over her 11 days in jail — particularly in misgendering her.
>
> The Sheriff's Office encourages deputies to use the names and pronouns true to the individual, he said. But it's not a written policy.
>
> "We don't need to traumatize these people," Gualitieri said, "so I'll look at that."

Varn, Kathryn. "Misgendered and mistreated in jail: A Pinellas transgender woman shares her story", *Tampa Bay Times*, March 10, 2020; retrieved October 27, 2020, from: https://www.tampabay.com/special-reports/2020/03/10/misgendered-and-mistreated-in-jail-a-

pinellas-transgender-woman-shares-her-story/ (attached hereto as **Exhibit "AA"**).

19. Furthermore,

> The jail classification policy calls for assessing the needs of each inmate. But in practice, trans inmates generally have only two options: **protective custody, or male or female general population housing based on their genitalia, Gualtieri said**.
>
> "I know enough about operating that facility and the issues and the challenges that **I'm not going to put someone with male genitalia in the female side**," he said. "There's no way I'm going to do that and have a situation where people are having sex in the jail."
>
> The sheriff said there have been complaints when trans people were housed with the gender they identify with — but that has happened at Safe Harbor, a homeless shelter his agency runs in the jail complex, he said, not inside the jail itself.
>
> Using only genitalia to determine housing is a violation of the federal Rape Elimination Act. Gualtieri said his agency is not violating federal policy because inmates who don't feel safe have the option of protective custody. Studies, though, show that option puts inmates at risk of severe psychological harm.
>
> **Even Gualtieri himself described that option as "hell."**

Id. (emphasis added).

20. This Court must consider whether these policies and actions, described by Gualtieri himself as "hell" and "traumatizing", meet the very minimal threshold for surviving a motion to dismiss, and thanks to Sheriff Gualtieri's own words, it should not be a difficult decision.

## MEMORANDUM OF LAW

**I.   STANDARD OF REVIEW.**

**A.  Motions for Dismiss for Failure to State a Claim.**

The threshold for surviving a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is a low one. Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al., 711 F.2d 989, 995 (11th Cir.1983). A plaintiff must plead only enough

facts to state a claim to relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) (abrogating the "no set of facts" standard for evaluating a motion to dismiss established in Conley v. Gibson, 355 U.S. 41, 45–46, (1957)). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. Id. (*citing* Sanjuan v. American Board of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir.1994)). In evaluating the sufficiency of a complaint in light of a motion to dismiss, the well pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994–95.

Because of the liberal pleading requirements of the Federal Rules, rarely will a motion to dismiss for failure to state a claim be granted. Quality Foods, 711 F.2d at 995. Indeed, such a motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (*quoting* Conley, 355 U.S. at 45–46, 78 S.Ct. at 102; *accord* McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 246 (1980); Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 602 (5th Cir.1981); Quinonez v. Nat'l Ass'n of Sec. Dealers, Inc., 540 F.2d 824, 826-827 (5th Cir. 1976).

### B. Qualified Immunity.

The Defendant has moved to dismiss based upon the affirmative defense of qualified immunity. The Supreme Court of the United States has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); *see also,* Lumley v. City of Dade City, 327 F.3d 1186, 1193-94 (11th Cir. 2003).

The test for whether a governmental defendant is entitled to qualified immunity from

liability in his individual capacity involves a two-step analysis. Hope v. Pelzer, 536 U.S. 730 (2002). Before applying the test, a government official first must demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (*quoting* Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir. 1983) ).

If the defendant satisfies this burden, the first prong of the test requires the plaintiff to show either that the official's actions "violated clearly established constitutional law" or a federal statute. Id.; Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id., at 201. Furthermore, "if a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.' " Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

## II.    ARGUMENT.

### A. The First Amended Complaint is not "prolix", and it is certainly not subject to dismissal based upon Rule 8.

Secondly, it should be noted that the Defendant's argument regarding the alleged "prolix" nature of the First Amended Complaint do not comport with his arguments regarding a "shotgun pleading". One is left wondering how a detailed, allegedly "prolix" pleading could simultaneously be too specific and not specific enough, and given the nature of the Defendant's arguments, it is clear that were it shorter, they would be arguing that it did not set forth sufficient facts.

The First Amended Complaint, at 51 pages and 258 paragraphs, is simply a well-researched and detailed explanation of the various issues and complex concepts described therein, which is especially important given the many defendants. Further, the introductory factual allegations are only 19 pages and 103 paragraphs. The rest of the Complaint consists of Counts I to VII.

Compared to other pleadings deemed "prolix" by this Court, the First Amended Complaint does not even come close. For example, this Court found that a complaint consisting of 134 pages and 566 paragraphs long, where the "recitation of the various counts does not begin until page 126, paragraph 526", such was a good example of a "prolix" claim. Lawrie v. The Ginn Companies, LLC, 309-CV-446-J-32JBT, 2010 WL 3746725, at *3 (M.D. Fla. Sept. 21, 2010)

Another example, in Al-Rayes v. Willingham, 3:15-CV-107-J-34JBT, 2016 WL 6080826, at *3 (M.D. Fla. Aug. 15, 2016), report and recommendation adopted, 3:15-CV-107-J-34JBT, 2016 WL 6071636 (M.D. Fla. Oct. 17, 2016), the complaint was deemed "prolix" by this Court where it had 66 pages *but* the first 41 pages and 202 paragraphs preceded any of the counts.

The Southern District found that a complaint spanning 142 pages was "prolix". Lawrie v. Ginn Dev. Co., LLC, 3:09-CV-446-J-32JBT, 2014 WL 4788067, at *3 (M.D. Fla. Sept. 19, 2014), aff'd, 656 Fed. Appx. 464 (11th Cir. 2016). The same court found that a complaint consisting of 507 pages (inclusive of exhibits), 341 paragraphs, and 7 counts was also "prolix". Shaprio v. Unum Life Ins. Co. of Am., 17-CV-23992-UU, 2017 WL 10379581, at *1 (S.D. Fla. Nov. 29, 2017).

To the contrary, because of the nature of this suit, it was important to address the medical issues therein, particularly where issues of transgender health and terminology might not be well known to the reader, as well as by laying out as many of the facts of the specific incidents that led to the Counts as could be stated to explain how all of the different Defendants contributed.

**B. The First Amended Complaint is not an impermissible "shotgun pleading".**

This allegation is simply untrue, as the Defendant argues that the Plaintiff has re-alleged all preceding counts and is "vague" and what-not. In fact, one of the chief differences between the initial Complaint and the First Amended Complaint is that the Plaintiff corrected all of the re-allegations in each count, such that they only re-allege the introductory facts and explanations up

to paragraph 103. Furthermore, for the Defendant to allege that the First Amended Complaint is "vague" and "conclusory", it is quite interesting that this section of the Motion to Dismiss is, well…vague and conclusory.

### C.  The Defendant is arguing out of both sides of their mouths.

First off, it should be noted that the Defendant's argument here regarding <u>Keohane v. Florida Dep't of Corr. Sec'y</u>, 952 F.3d 1257, 1275, 1279 (11th Cir. 2020) (hereinafter, <u>Keohane II</u>), is interesting, considering that in Deputy Steve Cox, Jr.'s Motion to Dismiss (the "entirety" of which is incorporated into the Defendant's instant Motion to Dismiss) states that, "Because amendment would be futile — Bello cannot change the state of the law in December 2019 — dismissal with prejudice on a finding that Deputy Cox is entitled to qualified immunity is warranted." *Motion to Dismiss Amended Complaint of Deputy Cox* [Dkt. 35], p. 10, ¶ 1.

The reasoning for why this is interesting is because the law in place during the entirety of the time that the Plaintiff was in the County Jail was the Southern District's decision in <u>Keohane v. Jones</u> (hereinafter, <u>Keohane I</u>), which ordered that the Florida Department of Corrections:

> permit Ms. Keohane access to the same undergarments, hair-length policy, and makeup items available for inmates housed in Defendant's female facilities so that she can socially transition to treat her gender dysphoria.

328 F. Supp. 3d 1288, 1318 (N.D. Fla. 2018), <u>vacated sub nom.</u> <u>Keohane v. Florida Dep't of Corr. Sec'y</u>, 952 F.3d 1257 (11th Cir. 2020).

So if this Court were to proceed on the perspective that the Defendant is not liable because of "the state of the law in December 2019", well, **the state of the law at that time was that transgender women <u>must</u> be permitted to access the same undergarments, hair-length policy, and makeup items available for non-transgender women in jail facilities**.

Surely, as the chief law enforcement officer of Pinellas County, as well as the chief

administrator and policy-maker of the County Jail, Sheriff Gualtieri was familiar with the Florida Department of Corrections operating under a requirement to provide the aforementioned treatment for transgender women's serious medical needs associated with gender dysphoria?[2]

### D. The Defendant either completely misunderstands, or has deliberately misstated, the holding in Keohane II.

The holding in Keohane II did not state that the undergarments, hair, and makeup issue (hereinafter, the "social transitioning issue") could lawfully be denied to transgender women. The court found that, because there was at the time a disagreement among the medical staff as to whether the social transitioning issue was medically necessary, their denial of that inmate's ability was "mere negligence", and did not rise to the level of the "deliberate indifference" needed to state a claim for Eighth Amendment cruel and unusual punishment.

In fact, a very telling aspect of the Keohane II decision states as follows:

> The FDC has given Keohane some, but not all, of what she wants—although it has denied her social-transitioning requests (at least as they pertain to clothing and grooming), it has provided mental-health counseling, hormone therapy, the use of female pronouns, safer housing accommodations, and private shower facilities. And like the prison officials in Kosilek, the FDC has struck that balance both because Keohane's treatment team has determined that her current regimen is sufficient to treat her gender dysphoria and because it has rationally concluded that her social-transitioning requests—to dress and groom herself as a woman—would present significant security concerns in an all-male prison.

Keohane II, 952 F.3d at 1277. It is all there in black and white: the reason that the Eleventh Circuit found that the social transitioning issue was only "mere negligence" was because **there was already in place "current regimen" that was treating the inmate's gender dysphoria.** Id.

Here, *to the contrary*, **the Defendant and his subordinate Co-Defendants refused to**

---

[2] Notably, the Plaintiff is confining the arguments herein to transgender women, due to the Plaintiff being a transgender woman, and given that transgender women undergo different treatment regimens than transgender men. However, the comparable medical treatment that should be available to transgender men who are detainees or inmates must surely be addressed by the Defendants as well.

**treat the Plaintiff's gender dysphoria in <u>any</u> way, and even refused to stop calling her "Sir" and "Mister" and deliberately refusing to even acknowledge any aspect of her gender identity whatsoever.** While the defendants in <u>Keohane II</u> might have successfully argued that by treating *some, but not all*, of that inmate's serious medical needs, they had only committed "mere negligence" with respect to social transitioning, that is not in any way applicable to this case, where the Defendants were literally taunting and mocking the Plaintiff's serious medical needs.

To compare to the serious medical need of an injury that is bleeding, the decision in <u>Keohane II</u> is akin to the court saying that, because a medic has already put a bandage on the wound, it was only "mere negligence" for that medic to fail to *also* give the injured person an antibiotic to deal with infection, as the medic was clearly attempting to care for the injured person. To read <u>Keohane II</u> the way that the Defendant has argued would be to say that, if the medic failed to put a bandage on the wound, it could *also* ignore the antibiotic treatment. Again, the Defendant's interpretation of the holding in <u>Keohane II</u> defies logic and common sense.

> **E. There is no debate that gender dysphoria is a "serious medical need" requiring treatment, and that the Defendant participated in the refusal to medically treat the Plaintiff.**

With respect to the subject of serious medical needs, here is what the Eleventh Circuit stated in <u>Keohane II</u>, with respect to the serious medical need component:

> Here, as already noted, there's no debate about the objective component. **The [Florida Department of Corrections] admits—and the parties thus agree—that Keohane's gender dysphoria constitutes a "serious medical need."**

952 F.3d at 1266 (emphasis added).

If the Florida Department of Corrections recognizes that gender dysphoria is a serious medical need, and they *also* agreed that it was a serious medical need even back in 2018 in <u>Keohane I</u>, why is the Defendant here arguing that he had no duty to do *anything* to treat it?

### F. The Defendant's case-law regarding pronouns is neither binding in this district, nor supported by the Florida Bar.

First, the Defendant argues that, "[n]o court has ever found or held that misgendering someone is unconstitutional", and cites to the non-precedential decision in United States v. Varner, 948 F.3d 250, 254-55 (5th Cir. 2020) ("[N]o authority supports the proposition that we may require litigants, judges, court personnel, or anyone else to refer to gender dysphoric litigants with pronouns matching their subjective gender identity."). Not only does this have very little to do with the Defendant's complete failure to address the Plaintiff's gender dysphoria in *any* way, but frankly, the Florida Bar, in Florida Rule of Professional Conduct 4-8:4(d), considers such conduct to be a professional violation.[3]

Furthermore, the Varner case did not involve either Eighth Amendment or Fourteenth Amendment issues, anything to do with "serious medical need", or anything *else* relevant *whatsoever* to this case. The Defendant merely plucked their quotation from a discussion of courtroom procedure and planted them into his Motion to Dismiss, in the hopes that this Court would overlook the deliberate misinterpretation of the nature of that court's commentary.

### G. The Defendant's other citations are also distinguishable and inapplicable.

For example, it should be noted that the unpublished case cited by the Defendant was later affirmed, but *criticized*, by the Eleventh Circuit, which stated that, "[t]he district court dismissed the claims against Wilkins and Montaldi in their individual capacities *because it found that Hood failed to allege any personal refusals to treat gender dysphoria*" (emphasis added), and that the dismissal with prejudice ruling was in error, thus remanding to the district court for the plaintiff to amend her complaint. Hood v. Dep't of Children & Families, 700 Fed. Appx. 988, 990 (11th Cir.

---

[3] Notably, the Undersigned affirms to the fact that she received an ethics opinion from the Florida Bar Ethics Hotline in mid-2019, prior to the events in this case, confirming that attorneys commit an ethical violation by intentionally misgendering a transgender litigant or witness.

2017). In Hood, one of the main issues was that *when filed*, the institution did not have *any* treatment program for transgender inmates, but it had later enacted one, making the claims as originally pled "moot". Here, the Defendant argues that they are under **no** obligation to do *anything* for transgender prisoners, not even the basic human decency of referring to the Plaintiff by her proper pronouns (she/her/hers), **which would have cost the County Jail absolutely *nothing***.

Furthermore, the Defendant's citation to a 1997 Sixth Circuit case is patently *ridiculous,* as in 1997, most people were not aware of transgender people, and the state of transgender civil rights has changed immensely since then, not to mention the fact that it carries far less weight than the Florida federal cases that he omitted. In fact, the decision in Edmo v. Corizon, Inc., 935 F.3d 757 (9th Cir. 2019), cert. denied sub nom. ID DOC, et al. v. Edmo, Adree, 19-1280, 2020 WL 6037411 (U.S. Oct. 13, 2020), would be a much more applicable ruling to cite with respect to persuasive authority (transgender prisoner must be afforded gender confirmation surgery).

Furthermore, the time for the Defendant to argue about the Supreme Court's seminal decision in Bostock v. Clayton County, Georgia, 140 S. Ct. 1731 (2020), and whether it applies to the Fourteenth Amendment and disparate impact claims is likely not yet upon the parties at this initial stage. However, it should be noted that the Eleventh Circuit recently upheld this Court's decision in Adams by & through Kasper v. Sch. Bd. of St. Johns County, Florida, 318 F. Supp. 3d 1293 (M.D. Fla. 2018), aff'd sub nom. Adams by & through Kasper v. Sch. Bd. of St. Johns County, 968 F.3d 1286 (11th Cir. 2020), whereupon the Eleventh Circuit discussed the applicability of Bostock outside of the realm of Title VII, stating, "Bostock confirmed that workplace discrimination against transgender people is contrary to law. Neither should this discrimination be tolerated in schools." Id., at 1310. The Eleventh Circuit also affirmed that the violations against the plaintiff in that suit were violations of the Fourteenth Amendment. Id.

Furthermore, while the Eleventh Circuit in <u>Keohane II</u> determined that they could no longer address a policy as it had been rescinded as moot, they affirmed that gender dysphoria (the psychological term for being transgender) clearly constitutes a "serious medical need" and stated:

> It seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of "deliberate indifference"—anti-medicine, if you will.

952 F.3d at 1266–67.  In addition, the court went on to state that:

> **Unsurprisingly to us, other courts considering similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment.** *See, e.g.*, <u>Fields v. Smith</u>, 653 F.3d 550, 559 (7th Cir. 2011); *see also* <u>Hicklin v. Precynthe</u>, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018); <u>Soneeya v. Spencer</u>, 851 F. Supp. 2d 228, 247 (D. Mass. 2012).

<u>Id.</u>, at 1267 (emphasis added). Notably, the case under review by the court in that case, <u>Keohane I</u>, had found a more expansive view of the application of the Eighth Amendment prohibition of cruel and unusual punishment with relation to social transitioning items than the Eleventh Circuit would uphold, but that decision was in place from August 22, 2018 to March 11, 2020, and all of the conduct in this case took place during that time period, so any of the Defendant's claims that they were unaware of the established constitutional rights of the Plaintiff fail as a matter of law. Further, unlike in <u>Keohane II</u>, this issue is not "moot".

### H. The Fourteenth Amendment claims are well pleaded and backed up by sound case-law, and Sheriff Gualtieri is liable as the chief policymaker for the County Jail.

First off, it should be noted that the same Defendant who complained of the First Amended Complaint being "prolix" is now arguing that the allegations against the Defendant are not sufficiently detailed enough to describe his specific actions and involvement.

First off, pursuant to Pinellas County Code Section 74-61(b)(2), "The Pinellas County sheriff shall enforce all existing state laws, federal laws, and administrative rules concerning the operation and maintenance of county jails." Pursuant to § 30.53, Fla. Stat., "[t]he independence of sheriffs shall be preserved concerning the purchase of supplies and equipment, selection of personnel, and the hiring, firing and setting of salaries of such personnel…" Additionally, the Florida Supreme Court has held that "the internal operation of the sheriff's office…is a function which belongs uniquely to the sheriff as the chief law enforcement officer of the county." Weitzenfeld v. Dierks, 312 So.2d 194, 196 (Fla. 1975).

A plaintiff bringing a § 1983 action against a municipality based upon the acts of its employees must sufficiently allege a constitutional violation and show that the municipality itself injured the plaintiff by having in place a "policy or custom" which violated the plaintiff's rights. *See*, City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) and Buckner v. Toro, 116 F.3d 450, 451 (11th Cir. 1997) (*citing* Monell, 436 U.S. 658). Under Monell, the municipal policy or custom must be the moving force behind the constitutional violation and "only where a failure to train reflects a deliberate or conscious choice by the municipality can the failure be properly thought of as an actionable city policy." City of Canton, Ohio v. Harris, 489 U.S. 378, 379 (1989).

"Municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (citation omitted). To identify the relevant policymaking officials, "the court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." Rosario v. Miami-Dade Cty., 490 F. Supp. 2d 1213, 1221-22 (S.D. Fla. 2007) (citation

omitted) (emphasis added). A plaintiff must show that the local government entity has authority and responsibility over the governmental function in issue and identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue. Id., at 1330 (*citing* Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731 (1989)).

Determination of who is an official policymaker for § 1983 purposes is a question of law. The judicial determination of who is an official policymaker, although a federal question, is guided by state law. McMillan v. Monroe County, 520 U.S. 781, 784 (1971). In Jenkins v. Manatee County Sheriff, this Court held that the sheriff was clearly considered a municipality for purposes of a § 1983 action predicated on an alleged Eighth Amendment violation for inadequate medical care at the county jail. 2014 U.S. Dist. LEXIS 3232*, 2014 WL 105133 (M.D. Fla. January 20, 2014). This is consistent with Defendant Pinellas County, Florida's argument that the *Sheriff* is the correct party to the instant lawsuit, not the County. *See also*, Hoelper v. Coats, 2010 U.S. Dist. LEXIS 118255 (M.D. Fla. October 27, 2010) ("When a plaintiff sues a county sheriff in his official capacity under 42 U.S.C. § 1983, the suit is effectively a suit against the county.").

In Jones v. Lamberti, the Southern District specifically analyzed whether a sheriff, as chief correctional officer of a county, acts as a county policymaker under the laws of the State of Florida in the area of corrections. 2008 U.S. Dist. LEXIS 66163 (S.D. Fla. Aug. 28, 2008). The court determined that as chief correctional officer, a sheriff is "solely responsible for the operation of the existing correctional System." Lamberti, at *4. The Court ultimately held that "[t]he Sheriff is the final policymaker for the operation of the jails." Lamberti, at *5.

In short, Sheriff Gualtieri is the chief policymaker and municipal entity for the purposes of this suit, and as a result, should not be dismissed from this suit. Given that the Defendant has

already admitted liability and that his policies are "traumatized" the Plaintiff and are "hell", there is no question that Sheriff Gualtieri is liable.

>    I. **The Fourteenth Amendment claims are solidly pleaded, and any references to the Eighth Amendment that are contained in the First Amended Complaint are solely in reference to the fact that the standards for cruel and unusual punishment claims are identical.**

Jail guards, deputies, correctional officers, and the like are, "of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment". Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). However, technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like the Plaintiff. Goebert, 510 F.3d at 1326; Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1268 (11th Cir.2005). However, **"the standards under the Fourteenth Amendment are identical to those under the Eighth"**. Goebert, 510 F.3d at 1326 (emphasis added); Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir.2005). Any remnants of references to the Eighth Amendment appearing in the First Amended Complaint that are outside of the applicability of the standards being identical are unintentional, and it is clear that the Plaintiff therein is not alleging counts based upon the Eighth Amendment, but rather, the Fourteenth Amendment.

>    J. **The Defendant is also liable under a supervisory liability theory.**

"Supervisory officials cannot be held vicariously liable under section 1983 for the actions of their subordinates unless the supervisor 'personally participates in the alleged unconstitutional conduct' or 'there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.' " Smith v. Deal, No. 18-13424, 2019 WL 378568, at *2 (11th Cir. Jan. 30, 2019) (*quoting* Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) ). "A causal connection can be established when facts support an inference that the supervisor directed the

subordinates to act unlawfully **or knew that the subordinates would act unlawfully and failed to stop them from doing so**." Smith v. LePage, 834 F.3d 1285, 1298 (11th Cir. 2016) (emphasis added) (quotations and citation omitted). A causal connection also " 'can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.' " Knight through Kerr v. Miami-Dade Cty., 856 F.3d 795, 820 (11th Cir. 2017) (*quoting* Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) ). "But one incident will not suffice; rather, [t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Id. (quotations and citation omitted). Manago v. Glass, 3:16-CV-1508-J-32JBT, 2019 WL 1014440, at *11 (M.D. Fla. Mar. 4, 2019). A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003), or that a supervisor's "custom or policy ... resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir.1991).

    Here, the Defendant's own words to the media establish that he directed these unwritten policies and procedures, and the uniformity of the other subordinate Co-Defendants' application of those policies evinces an indisputable top-down culture of transphobia at the County Jail. Sheriff Gualtieri knew exactly what was going on in his County Jail, because he implemented those policies, even though he knew that they would be "hell" for detainees like the Plaintiff.

    Finally, this is the preliminary Rule 12(b)(6) dismissal stage, not the summary judgment stage, and as such, the Plaintiff should have the opportunity to conduct discovery and find out more about the official and unofficial policies of the Defendant and his part in directing or in

failing to stop the other subordinate Co-Defendants from conducting these unlawful actions, and by approving, condoning, and ratifying the unlawful actions on multiple occasions.

While the Defendant *in the Motion to Dismiss* surely appears to think that the Plaintiff's claims are 'trivial', the Defendant sang a completely different tune in front of the media, where he *acknowledged* the serious nature of the policies' effects on transgender inmates. Further, these constitutional deprivations have certainly been considered significant in cases before the Eleventh Circuit and other Florida federal courts.

## CONCLUSION

In short, the Defendant has *not* proved that they are entitled to dismissal, and this Court should not grant the Defendant's requested relief, particularly at such an early stage of these proceedings. In the alternative, and "giving recognition to the well established principle that liberality in amendments to pleadings are to be favored by the courts", the Plaintiff would request that this Court permit the filing of an amended complaint. Baugher v. Alachua County, 305 So. 2d 838, 839–40 (Fla. 1st DCA 1975).

WHEREFORE, the Plaintiff respectfully requests that this Court deny the Motion to Dismiss Amended Complaint of Sheriff Gualtieri, and for any and all other relief as this Court deems in the interests of justice.

Respectfully Submitted,

_____
ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084

904.602.9400 (Office)<br>
904.299.5400 (Fax)<br>
reringer@lentolawgroup.com<br>
<em>Attorney for Plaintiff</em>

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 27, 2020, a copy of the foregoing has been furnished by CM/ECF to: Kelly L. Vicari, Esq., Pinellas County Attorney's Office, 315 Court Street, Sixth Floor, Clearwater, Florida 33756, kvicari@pinellascounty.org, eservice@pinellascounty.org, and to Paul G. Rozelle, Esq., Pinellas County Sheriff's Office, 10750 Ulmerton Road, Largo, FL 33778, prozelle@pcsonet.com, amarcott1@pcsonet.com.

Respectfully Submitted,

*/s/ Rook Ringer*

_____
ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
*Attorney for Plaintiff*