UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO<br><br>Plaintiff,<br><br>v.<br><br>ROBERT A. GUALTIERI, in his official capacity as Sheriff of Pinellas County, PINELLAS COUNTY, FLORIDA, et al.,<br><br>Defendants. | Case No.: 8:20-cv-02005-TPB-AEP |

## PLAINTIFF'S RESPONSE TO MOTION TO DISMISS SECOND AMENDED COMPLAINT OF SHERIFF GUALTIERI AND INCORPORATED MEMORANDUM OF LAW

COMES NOW the Plaintiff, CARLOS RAUL BELLO NOGUEDA, a/k/a KARLA BELLO (hereinafter, "Plaintiff" or "Karla"), by and through her undersigned attorney, and hereby responds in opposition to the Defendants' Motion to Dismiss Second Amended Complaint of Sheriff Gualtieri [Dkt. #87] (hereinafter, the "Motion to Dismiss") and states as follows:

### INTRODUCTION AND
### PROCEDURAL DEFICIENCIES OF THE MOTION TO DISMISS

1.      This is a federal civil rights case pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution for the Defendants' individual and collective personal, malicious, and unlawful violations under color of

state law of Plaintiff's individual rights, while the Plaintiff was a detainee at the Pinellas County Jail (hereinafter, the "Jail").

2.     On September 29, 2021, this Court issued and Order (hereinafter, the "Order") granting the Motion to Dismiss of the Doe Defendants and stuck the First Amended Complaint. [Dkt. #83].

3.     In addition, this Court's Order stated that:

> Second, all thirteen of the individually named defendants are represented by the same attorney, who filed nine separate motions to dismiss. No reason is apparent for the filing of separate motions. Absent some compelling reason, counsel should file a single motion under Rule 12 for the individually named defendants.

[Dkt. #83, pp. 2-3].

4.     The Defendant, Sheriff Robert A. Gualtieri (hereinafter, the "Defendant", "Gualtieri" or "Sheriff Gualtieri") filed the Motion to Dismiss on November 8, 2021.

5.     However, in addition to filing this motion separately from the other individually named Defendants, Gualtieri also incorporated the motion to dismiss [Dkt. #88] of the *other* individually named Defendants. [*See*, Dkt. #87, pp. 13-14].

6.     The Plaintiff argues that it was not in the spirit of this Court's Order to proceed in such a fashion, nor did this Court intend that once again, the Plaintiff has to respond to the same arguments in multiple responses.

7.     Additionally, since this Motion to Dismiss is 14 pages long and incorporates the other Motion to Dismiss of the Individually Named Defendants [Dkt. #88], which is 22 pages long, the Plaintiff argues that this Motion is procedurally

improper pursuant to Local Rule 3.01(a) which states that a motion must be "a single document no longer than twenty-five pages inclusive of all parts".

8.      Regardless, given that the Motion to Dismiss incorporates arguments from the other Defendants' motions to dismiss, the Plaintiff's responses against those incorporated arguments are included herein so as not to require this Court to switch back and forth between various motions.

9.      Unfortunately, since under Local Rule 3.01(b), a response to a motion must be no longer than 20 pages, this puts the Plaintiff at a disadvantage, and she has had to condense some of her arguments in response.

## POLICIES AND PROCEDURES

10.     Notably, the Defendant argues that the Second Amended Complaint (hereinafter, the "Complaint") does not list the specific policies, practices, or customs concerning the provision of hormone replacement therapy, housing, or bathroom use with respect to transgender inmates.

11.     However, on information and belief, at least at the time of the incidents described in the Complaint, these policies and practices were not in any *written* form, leading to the de-facto policies, practices, and customs of the Pinellas County Sheriff's Office (hereinafter, "PCSO") being that transgender detainees were treated according to their sex assigned at birth, putting transgender women in jail with men, and transgender men in jail with women.

12.     In fact, the Defendant himself admitted publicly that no such policies are *written down*, as is discussed in the section herein titled "Sheriff Gualtieri's Admission

of Liability", wherein he also described the policies consistently with the allegations in the Complaint.

13.    At the very least, if there *are* any *written* policies or procedures of PCSO with respect to transgender detainees, they will be subject to discovery in this case.

## SHERIFF GUALTIERI'S ADMISSION OF LIABILITY

14.    One issue is that the Motion to Dismiss appears to contradict Sheriff Gualtieri himself, who when asked by the media about the Plaintiff's treatment in the Jail, he made multiple public statements, as memorialized in the Tampa Bay Times:

> Pinellas Sheriff Bob Gualtieri said his jail staff does the best it can to address the needs of inmates, but he acknowledged they at times mistreated Bello over her 11 days in jail — particularly in misgendering her.

> The Sheriff's Office encourages deputies to use the names and pronouns true to the individual, he said. But it's not a written policy.

> "We don't need to traumatize these people," Gualitieri said, "so I'll look at that."

Varn, Kathryn. "Misgendered and mistreated in jail: A Pinellas transgender woman shares her story", *Tampa Bay Times*, March 10, 2020; retrieved October 27, 2020, from: https://www.tampabay.com/special-reports/2020/03/10/misgendered-and-mistreated-in-jail-a-pinellas-transgender-woman-shares-her-story/    (attached hereto as **Exhibit "A"**).

15.    Furthermore,

> The jail classification policy calls for assessing the needs of each inmate. But in practice, trans inmates generally have only two options: **protective custody, or male or female general**

population housing based on their genitalia, Gualtieri said.

"I know enough about operating that facility and the issues and the challenges that **I'm not going to put someone with male genitalia in the female side**," he said. "There's no way I'm going to do that and have a situation where people are having sex in the jail."

The sheriff said there have been complaints when trans people were housed with the gender they identify with — but that has happened at Safe Harbor, a homeless shelter his agency runs in the jail complex, he said, not inside the jail itself.

Using only genitalia to determine housing is a violation of the federal Rape Elimination Act. Gualtieri said his agency is not violating federal policy because inmates who don't feel safe have the option of protective custody.

Studies, though, show that option puts inmates at risk of severe psychological harm.

**Even Gualtieri himself described that option as "hell."**

Id. (emphasis added).

16.    This Court must consider whether these policies and actions, described by Gualtieri himself as "hell" and "traumatizing", meet the very minimal threshold for surviving a motion to dismiss, and thanks to Sheriff Gualtieri's own words, it should not be a difficult decision.

## MEMORANDUM OF LAW

### I.    STANDARD OF REVIEW.

### A. Motions for Dismiss for Failure to State a Claim.

The threshold for surviving a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is a low one. Quality Foods de Centro Am., S.A. v. Latin Am.

Agribusiness Dev. Corp., S.A., et al., 711 F.2d 989, 995 (11th Cir.1983). A plaintiff must plead only enough facts to state a claim to relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) (abrogating the "no set of facts" standard for evaluating a motion to dismiss established in Conley v. Gibson, 355 U.S. 41, 45–46, (1957)). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. Id. (*citing* Sanjuan v. American Board of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir.1994)). In evaluating the sufficiency of a complaint in light of a motion to dismiss, the well pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994–95.

Because of the liberal pleading requirements of the Federal Rules, rarely will a motion to dismiss for failure to state a claim be granted. Quality Foods, 711 F.2d at 995. Indeed, such a motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (*quoting* Conley, 355 U.S. at 45–46, 78 S.Ct. at 102; *accord* McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 246 (1980); Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 602 (5th Cir.1981); Quinonez v. Nat'l Ass'n of Sec. Dealers, Inc., 540 F.2d 824, 826-827 (5th Cir. 1976).

## II.   ARGUMENT.

### A. The First Amended Complaint is not "prolix", and it is certainly not subject to dismissal based upon Rule 8.

To begin, the Defendant's argument regarding the alleged "prolix" nature of the

Complaint does not comport with his arguments regarding a "shotgun pleading". One is left wondering how a detailed, allegedly "prolix" pleading could simultaneously be *too* specific and not specific *enough*, and given the nature of the Defendant's arguments, were it shorter, he would be arguing that it did not set forth sufficient facts.

The Complaint, at 60 pages and 264 paragraphs, is simply a well-researched and detailed explanation of the various issues and complex concepts described therein. Further, the introductory factual allegations are only 22 pages and 97 paragraphs. The rest of the Complaint consists of Counts I to VIII.

In fact, it was necessary to increase the size of the Complaint in order to comply with this Court's Order, which required that the complaint, "must allege facts showing the direct involvement of each defendant in [each] civil rights violation". [Dkt. # 83, p. 2]. Essentially, this Court appeared to recognize the need for additional fact pleading in this case, so the Defendant's arguments that the additional paragraphs are unnecessary or confusing are not grounded in fact.

In fact, compared to other pleadings deemed "prolix" by this Court, the Complaint does not even come close. For example, this Court found that a complaint consisting of 134 pages and 566 paragraphs long, where the "recitation of the various counts does not begin until page 126, paragraph 526", such was a good example of a "prolix" claim. Lawrie v. The Ginn Companies, LLC, 309-CV-446-J-32JBT, 2010 WL 3746725, at *3 (M.D. Fla. Sept. 21, 2010). Another example, in Al-Rayes v. Willingham, 3:15-CV-107-J-34JBT, 2016 WL 6080826, at *3 (M.D. Fla. Aug. 15, 2016), report and recommendation adopted, 3:15-CV-107-J-34JBT, 2016 WL 6071636

(M.D. Fla. Oct. 17, 2016), the complaint was deemed "prolix" by this Court where it had 66 pages *but* the first 41 pages and 202 paragraphs preceded any of the counts. The Southern District found that a complaint spanning 142 pages was "prolix". <u>Lawrie v. Ginn Dev. Co., LLC</u>, 3:09-CV-446-J-32JBT, 2014 WL 4788067, at *3 (M.D. Fla. Sept. 19, 2014), <u>aff'd</u>, 656 Fed. Appx. 464 (11th Cir. 2016). The same court found that a complaint consisting of 507 pages (inclusive of exhibits), 341 paragraphs, and 7 counts was also "prolix". <u>Shaprio v. Unum Life Ins. Co. of Am.</u>, 17-CV-23992-UU, 2017 WL 10379581, at *1 (S.D. Fla. Nov. 29, 2017).

To the contrary, because of the nature of this suit, it was important to address the medical issues therein, particularly where issues of transgender health and terminology might not be well known to the reader, as well as by laying out as many of the facts of the specific incidents that led to the Counts as could be stated to explain how all of the different Defendants contributed.

Furthermore, the Defendant's arguments about newspaper clippings and citation to <u>Simmons v. Bradshaw</u>, 879 F.3d 1157, 1168 (11th Cir. 2018) are misleading, as that case neither addresses "newspaper clippings", nor does it apply to the facts of this case. In fact, the only part of the <u>Simmons v. Bradshaw</u> decision that discusses anything *even remotely connected* to newspaper articles is **in the dissent, not the actual decision,** and there is absolutely nothing in the decision that backs up the Defendant's statement that, "[n]ewspaper articles are constitutionally irrelevant." [Dkt. #88, p. 18]. Notably, the dissent argued that the statements from press releases should have been considered. <u>Id.</u>, at 1174. In any case, the press releases in question

were not even close to the kind of evidence presented in this case.

In this case, the newspaper article is provided to show that Defendant Gualtieri admits to a having certain policies and guidelines, written or unwritten, that directly impacted this case. That is relevant – and pretty conclusive – evidence.

### B. The First Amended Complaint is not an impermissible "shotgun pleading"[1].

This allegation is simply untrue, as the Defendant knows full well that the only counts which name Gualtieri only name Pinellas County as an additional defendant, and certainly do not commingle or cause confusion with respect to the claims.

### C. The Prison Rape Elimination Act (hereinafter, the "PREA") specifically prohibits many of the things that Sheriff Gualtieri admits are policy of the Jail.

Ironically, Sheriff Gualtieri has a page on the Pinellas County Sheriff's Office dedicated to the PREA, located at https://www.pcsoweb.com/prison-rape-elimination-act-prea, so it is obvious that he recognizes its application to the Jail and to its practices. However, the PREA specifically says that:

> In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

28 C.F.R. § 115.42 (c).

> (f) Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.

---

[1] The Defendant incorporates the "shotgun pleading" arguments of [Dkt. #88] in Section V of the Motion to Dismiss. [Dkt. #87, p. 13].

28 C.F.R. § 115.42(f).

Gualtieri's blanket policy of basing jail assignments solely on genitalia is therefore explicitly prohibited by 28 C.F.R. § 115.42(c), and he explicitly stated that *that is his policy* in a direct quote to the Tampa Bay Times, as see in **Ex. "A"**, which was attached to the Complaint.

### D. This case is not solely dependent upon <u>Bostock</u>, as the Defendant argues.

The Defendant argues that the entire case is dependent upon the Supreme Court's decision in <u>Bostock v. Clayton County, Georgia</u>, 140 S. Ct. 1731 (2020), arguing that it was not the law at the time of the incarceration, but *the law at that time was actually more in favor of the Plaintiff*. Specifically, the law in place during the entirety of the time that the Plaintiff was in the Jail was the decision in <u>Keohane v. Jones</u> (hereinafter, <u>Keohane I</u>), which ordered that the Florida Department of Corrections:

> ...permit Ms. Keohane access to the same undergarments, hair-length policy, and makeup items available for inmates housed in Defendant's female facilities so that she can socially transition to treat her gender dysphoria.

328 F. Supp. 3d 1288, 1318 (N.D. Fla. 2018), <u>vacated sub nom.</u> <u>Keohane v. Florida Dep't of Corr. Sec'y</u>, 952 F.3d 1257 (11th Cir. 2020). As a result, **the state of the law at that time (in December of 2019) was that transgender women <u>must</u> be permitted to access the same undergarments, hair-length policy, and makeup items available for non-transgender women in jail facilities**. Surely, as the chief law enforcement officer of Pinellas County, as well as the chief administrator and policy-

maker of the County Jail, Sheriff Gualtieri was familiar with the Florida Department of Corrections operating under a requirement to provide the aforementioned treatment for transgender women's serious medical needs associated with gender dysphoria?[2]

Additionally, the holding in <u>Keohane v. Florida Dep't of Corr. Sec'y</u>, 952 F.3d 1257 (11th Cir. 2020) (hereinafter, <u>Keohane II</u>) did not state that the undergarments, hair, and makeup issue (hereinafter, the "social transitioning issue") could lawfully be denied to transgender women. The court found that, because there was at the time a disagreement among the medical staff as to whether the social transitioning issue was medically necessary, their denial of that inmate's ability was "mere negligence" and did not rise to the level of the "deliberate indifference" needed to state a claim for Eighth Amendment cruel and unusual punishment.

In fact, a very telling aspect of the <u>Keohane II</u> decision states as follows:

> The FDC has given Keohane some, but not all, of what she wants—although it has denied her social-transitioning requests (at least as they pertain to clothing and grooming), it has provided mental-health counseling, hormone therapy, the use of female pronouns, safer housing accommodations, and private shower facilities. And like the prison officials in <u>Kosilek</u>, the FDC has struck that balance both because Keohane's treatment team has determined that her current regimen is sufficient to treat her gender dysphoria and because it has rationally concluded that her social-transitioning requests—to dress and groom herself as a woman— would present significant security concerns in an all-male prison.

<u>Keohane II</u>, 952 F.3d at 1277. It is all there in black and white: the reason that

---

[2] Notably, the Plaintiff is confining the arguments herein to transgender women, due to the Plaintiff being a transgender woman, and given that transgender women undergo different treatment regimens than transgender men. However, the comparable medical treatment that should be available to transgender men who are detainees or inmates must surely be addressed by the Defendants as well.

the Eleventh Circuit found that the social transitioning issue was only "mere negligence" was because **there was already in place "current regimen" that was treating the inmate's gender dysphoria.** Id.

Here, *to the contrary*, **the Defendant and his subordinate Co-Defendants refused to treat the Plaintiff's gender dysphoria in <u>any</u> way, and even refused to stop calling her "Sir" and "Mister", deliberately refusing to even acknowledge any aspect of her gender identity whatsoever.** While the defendants in <u>Keohane II</u> might have successfully argued that by treating *some, but not all*, of that inmate's serious medical needs, they had only committed "mere negligence" with respect to social transitioning, that is not in any way applicable to this case, where the Defendants were literally taunting and mocking the Plaintiff's serious medical needs.

To compare to the serious medical need of an injury that is bleeding, the decision in <u>Keohane II</u> is akin to the court saying that, because a medic has already put a bandage on the wound, it was only "mere negligence" for that medic to fail to *also* give the injured person an antibiotic to deal with infection, as the medic was clearly attempting to care for the injured person. Here, the Plaintiff was not treated at all.

Furthermore, the time for the Defendant to argue about the Supreme Court's decision in <u>Bostock</u>, and whether it applies to the Fourteenth Amendment claims is likely not yet upon the parties at this initial stage. However, it should be noted that the Eleventh Circuit upheld *this* Court's decision in <u>Adams by & through Kasper v. Sch. Bd. of St. Johns County, Florida</u>, 318 F. Supp. 3d 1293 (M.D. Fla. 2018), <u>aff'd sub</u>

nom. Adams by & through Kasper v. Sch. Bd. of St. Johns County, 968 F.3d 1286 (11th Cir. 2020), whereupon the Eleventh Circuit discussed the applicability of Bostock outside of the realm of Title VII, stating, "Bostock confirmed that workplace discrimination against transgender people is contrary to law. Neither should this discrimination be tolerated in schools." Id., at 1310. The decision also affirmed that the actions in that suit were violations of the Fourteenth Amendment. Id.

Furthermore, while the Eleventh Circuit in Keohane II determined that they could no longer address a policy as it had been rescinded as moot, they affirmed that gender dysphoria (the psychological term for being transgender) clearly constitutes a "serious medical need" and stated:

> It seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of "deliberate indifference"— anti-medicine, if you will.

952 F.3d at 1266–67. In addition, the court went on to state that:

> **Unsurprisingly to us, other courts considering similar policies erecting blanket bans on gender-dysphoria treatments—without exception for medical necessity—have held that they evince deliberate indifference to prisoners' medical needs in violation of the Eighth Amendment.** *See, e.g.*, Fields v. Smith, 653 F.3d 550, 559 (7th Cir. 2011); *see also* Hicklin v. Precynthe, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018); Soneeya v. Spencer, 851 F. Supp. 2d 228, 247 (D. Mass. 2012).

Id., at 1267 (emphasis added). Notably, the case under review by the court in that case, Keohane I, had found a more expansive view of the application of the Eighth Amendment prohibition of cruel and unusual punishment with relation to social

transitioning items than the Eleventh Circuit would uphold, but that decision was in place from August 22, 2018 to March 11, 2020, and all of the conduct in this case took place during that time period, so any of the Defendant's claims that they were unaware of the established constitutional rights of the Plaintiff fail as a matter of law. Further, unlike in Keohane II, this issue is not "moot".

### E. The Fourteenth Amendment claims are well pleaded and Sheriff Gualtieri is liable as the chief policymaker for the Jail.

First off, it should be noted that the same Defendant who complained of the Complaint being "prolix" is now arguing that the allegations against the Defendant are not sufficiently detailed enough to describe his specific actions and involvement.

Secondly, pursuant to Pinellas County Code Section 74-61(b)(2), "The Pinellas County sheriff shall enforce all existing state laws, federal laws, and administrative rules concerning the operation and maintenance of county jails." Pursuant to § 30.53, Fla. Stat., "[t]he independence of sheriffs shall be preserved concerning the purchase of supplies and equipment, selection of personnel, and the hiring, firing and setting of salaries of such personnel…" Additionally, the Florida Supreme Court has held that "the internal operation of the sheriff's office…is a function which belongs uniquely to the sheriff as the chief law enforcement officer of the county." Weitzenfeld v. Dierks, 312 So.2d 194, 196 (Fla. 1975).

A plaintiff bringing a § 1983 action against a municipality based upon the acts of its employees must sufficiently allege a constitutional violation and show that the municipality itself injured the plaintiff by having in place a "policy or custom" which

violated the plaintiff's rights. *See*, <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) and <u>Buckner v. Toro</u>, 116 F.3d 450, 451 (11th Cir. 1997) (*citing* <u>Monell</u>, 436 U.S. 658). Under <u>Monell</u>, the municipal policy or custom must be the moving force behind the constitutional violation and "only where a failure to train reflects a deliberate or conscious choice by the municipality can the failure be properly thought of as an actionable city policy." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 379 (1989). "Municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986) (citation omitted). To identify the relevant policymaking officials, "the court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." <u>Rosario v. Miami-Dade Cty.</u>, 490 F. Supp. 2d 1213, 1221-22 (S.D. Fla. 2007) (citation omitted) (emphasis added). A plaintiff must show that the local government entity has authority and responsibility over the governmental function in issue and identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue. <u>Id.</u>, at 1330 (*citing* <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 731 (1989)).

Determination of who is an official policymaker for § 1983 purposes is a question of law. The judicial determination of who is an official policymaker, although a federal question, is guided by state law. <u>McMillan v. Monroe County</u>, 520 U.S. 781,

784 (1971). In <u>Jenkins v. Manatee County Sheriff</u>, this Court held that the sheriff was clearly considered a municipality for purposes of a § 1983 action predicated on an alleged Eighth Amendment violation for inadequate medical care at the county jail. 2014 U.S. Dist. LEXIS 3232*, 2014 WL 105133 (M.D. Fla. January 20, 2014). This is consistent with Defendant Pinellas County, Florida's argument that the *Sheriff* is the correct party to the instant lawsuit, not the County. *See also*, <u>Hoelper v. Coats</u>, 2010 U.S. Dist. LEXIS 118255 (M.D. Fla. October 27, 2010) ("When a plaintiff sues a county sheriff in his official capacity under 42 U.S.C. § 1983, the suit is effectively a suit against the county.").

In <u>Jones v. Lamberti</u>, the Southern District specifically analyzed whether a sheriff, as chief correctional officer of a county, acts as a county policymaker under the laws of the State of Florida in the area of corrections. 2008 U.S. Dist. LEXIS 66163 (S.D. Fla. Aug. 28, 2008). The court determined that as chief correctional officer, a sheriff is "solely responsible for the operation of the existing correctional System." <u>Lamberti</u>, at *4. The Court ultimately held that "[t]he Sheriff is the final policymaker for the operation of the jails." <u>Lamberti</u>, at *5.

In short, Gualtieri is the chief policymaker for the purposes of this suit, and as a result, should not be dismissed from this suit. The Plaintiff has sufficiently pleaded that the policies of the Jail, as created and/or enforced by the Defendant, are the moving force behind the Fourteenth Amendment violation. (See, ex., [Dkt. #84, ¶¶ 82-94]. Given that the Defendant has already admitted liability and that his policies "traumatized" the Plaintiff and are "hell", there is no question that Gualtieri is liable.

**F. The Fourteenth Amendment claims are solidly pleaded, and any references to the Eighth Amendment that are contained in the Complaint are solely in reference to the fact that the standards for cruel and unusual punishment claims are identical.**

Jail guards, deputies, correctional officers, and the like are, "of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment". Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). However, technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like the Plaintiff. Goebert, 510 F.3d at 1326; Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1268 (11th Cir.2005). However, **"the standards under the Fourteenth Amendment are identical to those under the Eighth"**. Goebert, 510 F.3d at 1326 (emphasis added); Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir.2005). Any references to the Eighth Amendment appearing in the Complaint that are outside of the applicability of the standards being identical are unintentional, and it is clear that the Plaintiff is not alleging *counts* based upon the Eighth Amendment, but rather, the Fourteenth Amendment.

**G. The Defendant is also liable under a supervisory liability theory.**

"Supervisory officials cannot be held vicariously liable under section 1983 for the actions of their subordinates unless the supervisor 'personally participates in the alleged unconstitutional conduct' or 'there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.' " Smith v. Deal, No. 18-13424, 2019 WL 378568, at *2 (11th Cir. Jan. 30, 2019) (*quoting* Cottone v.

Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) ). "A causal connection can be established when facts support an inference that the supervisor directed the subordinates to act unlawfully **or knew that the subordinates would act unlawfully and failed to stop them from doing so**." Smith v. LePage, 834 F.3d 1285, 1298 (11th Cir. 2016) (emphasis added) (quotations and citation omitted). A causal connection also " 'can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.' " Knight through Kerr v. Miami-Dade Cty., 856 F.3d 795, 820 (11th Cir. 2017) (*quoting* Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) ). "But one incident will not suffice; rather, [t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Id. (quotations and citation omitted). Manago v. Glass, 3:16-CV-1508-J-32JBT, 2019 WL 1014440, at *11 (M.D. Fla. Mar. 4, 2019). A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003), or that a supervisor's "custom or policy ... resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir.1991).

Here, the Defendant's own words to the media establish that he directed these unwritten policies and procedures, and the uniformity of the other subordinate Co-Defendants' application of those policies evinces an indisputable top-down culture of

transphobia at the Jail. Gualtieri knew exactly what was going on in his Jail, because he implemented those policies, even though he knew that they would be "hell" for detainees like the Plaintiff.

Finally, this is the preliminary Rule 12(b)(6) dismissal stage, not the summary judgment stage, and as such, the Plaintiff should have the opportunity to conduct discovery and find out more about the official and unofficial policies of the Defendant and his part in directing or in failing to stop the other subordinate Co-Defendants from conducting these unlawful actions, and by approving, condoning, and ratifying the unlawful actions on multiple occasions.

While the Defendant *in the Motion to Dismiss* surely appears to think that the Plaintiff's claims are 'trivial', the Defendant sang a completely different tune in front of the media, where he *acknowledged* the serious nature of the policies' effects on transgender inmates. Further, these constitutional deprivations have certainly been considered significant in cases before the Eleventh Circuit and other Florida federal courts.

## CONCLUSION

In short, the Defendant has *not* proved that they are entitled to dismissal, and this Court should not grant the Defendant's requested relief, particularly at such an early stage of these proceedings. In the alternative, and "giving recognition to the well established principle that liberality in amendments to pleadings are to be favored by the courts", the Plaintiff would request that this Court permit the filing of an amended complaint. Baugher v. Alachua County, 305 So. 2d 838, 839–40 (Fla. 1st DCA 1975).

WHEREFORE, the Plaintiff respectfully requests that this Court deny the Motion to Dismiss Second Amended Complaint of Sheriff Gualtieri [Dkt. #87], and for any and all other relief as this Court deems in the interests of justice.

Respectfully Submitted,

_____
ROOK ELIZABETH RINGER
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
904.602.9400 (Office)
904.299.5400 (Fax)
reringer@lentolawgroup.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 6, 2021, a copy of the foregoing has been furnished by CM/ECF to: Kelly L. Vicari, Esq., Pinellas County Attorney's Office, 315 Court Street, Sixth Floor, Clearwater, Florida 33756, kvicari@pinellascounty.org, eservice@pinellascounty.org, and to Paul G. Rozelle, Esq., Pinellas County Sheriff's Office, 10750 Ulmerton Road, Largo, FL 33778, prozelle@pcsonet.com, amarcott1@pcsonet.com.

Respectfully Submitted,

_____
ROOK ELIZABETH RINGER
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
*Attorney for Plaintiff*

# EXHIBIT "A"

Misgendered and mistreated in jail: A Pinellas transgender woman shares her story



ADVERTISEMENT

LONG READS

# Misgendered and mistreated in jail: A Pinellas transgender woman shares her story

What Karla Bello endured in the Pinellas County jail is emblematic of the way transgender people are treated while incarcerated, say advocates for transgender rights.

   



Karla Bello, 37, takes a break under the Tarpon Springs home where she lives with a home healthcare client. In November, Bello, a transgender woman, was booked into the Pinellas County jail and placed into male housing, where she said she was repeatedly misgendered and mistreated by jail deputies. [ DOUGLAS R. CLIFFORD | Times ]

By **Kathryn Varn**

Published Mar. 10
Updated Mar. 13

**Click here to read this story in Spanish.**

ADVERT

063



*Tampa Bay Times*

SUBSCRIBE

When the 37-year-old transgender woman was booked on a charge stemming
from unpaid traffic fines, she told a jail worker she was a woman. She had started
transitioning in her early 30s.

But she was strip-searched by male deputies and placed in a male cell block.
Deputies called her "sir."

She couldn't wear her hair extensions or makeup, nor did she have access to her
hormone medication — the basics she needed to treat a medical condition called
gender dysphoria. It can occur when one's gender doesn't align with their sex
assigned at birth.

ADVERTISEMENT

"It's so stupid to cry about hair and about makeup," she told the *Tampa Bay
Times*, her voice breaking. "But when they take who you say you are away — oh
my God."



**SPONSORED CONTENT**

*Tinnitus? When The Ringing
Won't Stop, Do This (It's Genius)*

*By* **Phytage Labs**

By day seven, she was suicidal, under close observation by jail staff.

"I'm going to die in here,'" she remembers thinking. "I'm just going to end my
life."

Incarceration is already dehumanizing. But it can be even more unforgiving for
those who faced discrimination and marginalization before they were locked up.

What Bello endured is emblematic of the way transgender people are treated
while incarcerated, advocates for transgender rights say.

Studies show they are disproportionately locked up and more likely to be abused
by staff and fellow inmates. That can lead to trauma and depression and, in

064

**RELATED:**　Florida prisons are miserable. They're even worse for transgender inmates.

Pinellas Sheriff Bob Gualtieri said his jail staff does the best it can to address the needs of inmates, but he acknowledged they at times mistreated Bello over her 11 days in jail — particularly in misgendering her.

The Sheriff's Office encourages deputies to use the names and pronouns true to the individual, he said. But it's not a written policy.

"We don't need to traumatize these people," Gualitieri said, "so I'll look at that."

ADVERTISEMENT



• • •

Born in Mexico, Bello grew up in Wimauma in a Catholic family.

At age 7 or 8, she said, she started to realize what she felt inside didn't align with the way she looked.

Soon after, she stumbled on a drag queen performing on a TV show. The revelation, that she could wear glitzy dresses and bright lipstick, excited her.

Then her mother spoke up:

"Oh, those people are disgusting," Bello recalled her saying.

The reaction shut down her self-exploration for years.

She graduated from Wharton High School in New Tampa in 2000, then enlisted in the Army. Bello tried to bury the sense that she was a woman, hoping it would diminish over time.

She tried dating men while stationed in Germany, but the homophobic ridicule from fellow soldiers was too much to handle. Ultimately, she was honorably discharged, she said, under the military's "don't ask, don't tell" policy, which banned gay and lesbian service members until it was repealed in 2011.

Tampa Bay Times

SUBSCRIBE



Karla Bello washes dishes at the home where she lives with a home healthcare client. [ DOUGLAS R. CLIFFORD | Times ]

ADVERTISEMENT



POWERED BY CONCERT

It took time and prayer — Bello still finds solace in a nondenominational relationship with God — before she reached a point where she believed she could start living as a woman.

She threw out her male clothes and finally started wearing lipstick, just as she'd dreamt of since childhood.

She started hormone therapy about four years ago, at first under the supervision of a doctor. But the transition took a toll on her caregiving business. She said she lost jobs due to discrimination.

She found another way to get hormones, without pricey doctor visits, and shifted her focus to launching her own business.

Despite those setbacks, she felt good.

"I've never felt more comfortable in my skin and happier than when I started taking the hormones," she said.

Then in 2018, cameras caught her running red lights in Tampa and Brandon. She was mailed two tickets, each requiring her to pay a $261 fine.

066

Eventually, the state suspended her license. When she was pulled over again in October 2019, this time for having a broken taillight, police gave her another ticket for driving with a suspended license.

She was supposed to appear in court Nov. 4.

Bello's life continued to unravel. Friendships and relationships started to fall apart. That included her mother, Bello said, who didn't accept her transition. Bello cut off contact.

ADVERTISEMENT



POWERED BY CONCERT

By the time of her court hearing, Bello said she was deeply depressed. Just getting out of bed was a challenge.

"I didn't feel like anyone loved me," she said.

RELATED: A Pinellas jail deputy broke a prisoner's arm. Does the jail have a problem?

When she didn't make it to her court hearing, authorities issued an arrest warrant.

Later that month, Bello intervened in a family issue involving one of her home healthcare clients. She called the police, knowing the risk she was taking.

Four days after officers responded to her call, one drove by that Gulfport home and checked the license plate on a car in the driveway.

It was Bello's Nissan Cube, and a records search turned up the active warrant. Gulfport police arrested her on a charge of failing to appear in court. She was booked into the Pinellas County jail Nov. 29.

Her bail was set at $513.

• • •

News reports paint a bleak picture of how transgender inmates, particularly women of color, are treated.

A Florida woman was found dead in her cell in 2016 after the state Department of Corrections denied her request for a name change.

067


10/27/2020

*Tampa Bay Times*

SUBSCRIBE

The same year, a lawsuit filed on behalf of 170 trans women alleged systemic abuse behind bars in Colorado.

In 2017, President Barack Obama's administration alleviated some of the risk by allowing transgender inmates to be housed according to their gender identity.

ADVERTISEMENT



POWERED BY CONCERT

Those protections have been weakened under President Donald Trump, said Richard Saenz, a senior attorney for the LGBTQ civil rights organization Lambda Legal. Saenz specializes in criminal justice and police misconduct.

In 2018, the federal Bureau of Prisons changed its transgender offender rules. Now, inmates are housed initially based on one's "biological sex" — a term the government doesn't define, Saenz noted — instead of their gender identity. The new rules also limit transgender inmates' access to hormones and other medical options.

Denying gender dysphoria treatment is a well-documented problem across the country. Courts have repeatedly sided with inmates who have challenged these restrictions, deciding that the rules violate Eighth Amendment protections against cruel and unusual punishment.

Treating gender dysphoria can go beyond hormones and surgery, said Rodrigo Heng-Lehtinen, deputy executive director for policy and action at the National Center for Transgender Equality. It also can include products and procedures that help someone express their gender identity, such as makeup, hair extensions and laser hair removal.

"The stakes are really high," he said. "Things that in the outside world may seem like just a matter of appearance — it can be a matter of life or death."

RELATED: 'This ends now': Florida prison system ordered to accommodate transgender inmate

The new, harsher rules don't apply to inmates in state prisons or, as in Bello's case, county jails, Saenz said. But he said they can set the tone for how trans people are treated in those institutions.

ADVERTISEMENT

068

Misgendered and mistreated in jail: A Pinellas transgender woman shares her story

ⓒ POWERED BY CONCERT

Florida's prison system determines housing assignments on a case-by-case basis that takes into consideration the inmate's safety and prison security. The Department of Corrections also has a policy for how to identify and treat inmates diagnosed with gender dysphoria.

But there are no consistent rules for how transgender people should be treated in Florida's county jails. The Florida Model Jail Standards Committee decides how prisoners should be treated in them. The committee is made up of three sheriffs, a county commissioner and a county director of corrections.

Those standards do not even mention transgender people.

The issue has not been raised before the committee, said James Aguiar, a Sumter County Sheriff's Office accreditation inspector who works with the group.

Even if there were rules to protect transgender inmates, Aguiar said the jail standards committee has no way to sanction a jail that doesn't comply.

The Prison Rape Elimination Act, a federal law passed in 2003 to protect vulnerable inmates from sexual violence, offers some guidance to prisons and jails for how to treat transgender prisoners. However, advocates say it is often not enforced.

Trans rights activists complain that this has allowed each facility to set its own rules.

"Depending on what your zip code is dictates which rights and protections you have," said Gina Duncan, director of transgender equality for Equality Florida.

A D V E R T I S E M E N T



ⓒ POWERED BY CONCERT

For example, Pasco County allows transgender inmates to pick the gender of the deputy who will search them, while Hillsborough County has no policies guiding how transgender prisoners should be searched.

069

*Tampa Bay Times*    SUBSCRIBE

In Duval County jails, a policy allows transgender inmates and other at-risk inmates to be kept in an open dorm away from the jail's regular population.

Officer Christian Hancock, a sheriff's spokesman, said inmates are let out of their cells one at a time for limited periods.

Not only are the rules inconsistent, but there's no mechanism for tracking how many trans people cycle through Florida's county jails. None of Tampa Bay's jails keep count.

The state prison system does, although they may be undercounted if inmates don't disclose their gender identity.

The Florida Department of Corrections said last week there were about 410 inmates in state prisons who identified as transgender and about 150 diagnosed with gender dysphoria.

• • •

When Bello was booked into the jail, she was wearing a dress, boots, a cardigan, blond hair extensions and a wire bra, jail records show.

Bras with underwire are prohibited in the jail, so it was confiscated along with everything else, per jail policy.

Bello hasn't changed her name or gender, so her name and sex assigned at birth still show up on arrest documents. The process can cost hundreds of dollars, and Bello hasn't been able to afford it — a common barrier for transgender people who want to change their legal names.

ADVERTISEMENT



InterSystems

LEARN MORE ▸

ℭ POWERED BY CONCERT

Bello said she told a jail staffer she was a woman, that her name was Karla.

Still, she said, what followed was an "onslaught of misgendering." Deputies used her deadname, or her birth name. Misgendering even extended to her jail records.

It wore her down, she said. She didn't know how else to explain her situation.

She was placed in temporary housing with men. Many inmates leave on bail, but Bello couldn't afford hers, and said she had no one to call for help.

Case 8:20-cv-02005-TPB-AEP   Document 92   Filed 12/06/21   Page 30 of 39 PageID 998

**Tampa Bay Times**

SUBSCRIBE

assess whether the inmate poses a threat to others or could be a target for sexual violence. Gender identity and sexual orientation are taken into account.

Bello was labeled a "potential victim," records show. Those inmates have the option of being placed in protective custody, akin to solitary confinement.

In the Pinellas jail, protective custody means living alone, save for time out for showers, an hour of recreation and limited activities, such as religious services or visits from the outside.

Gualtieri said Bello declined when his staff gave her the option of being placed in protective custody. Bello said she wasn't given any such option.

She was placed in a male housing unit. It was uncomfortable, she said, having to change clothes in corners. One inmate used a slur for transgender people against her, she said.

A D V E R T I S E M E N T



ⓒ POWERED BY CONCERT

She now wishes she could have stayed "anywhere but … with the men."



Karla Bello sorts through her makeup while getting ready for a walk. [ DOUGLAS R. CLIFFORD | Times ]

Why couldn't Bello stay with women, the gender with which she identifies? The jail classification policy calls for assessing the needs of each inmate. But in practice, trans inmates generally have only two options: protective custody, or


ADVERTISEMENT

*Tampa Bay Times*                                                                     SUBSCRIBE

"I know enough about operating that facility and the issues and the challenges that I'm not going to put someone with male genitalia in the female side," he said. "There's no way I'm going to do that and have a situation where people are having sex in the jail."

The sheriff said there have been complaints when trans people were housed with the gender they identify with — but that has happened at Safe Harbor, a homeless shelter his agency runs in the jail complex, he said, not inside the jail itself.

Using only genitalia to determine housing is a violation of the federal Rape Elimination Act. Gualtieri said his agency is not violating federal policy because inmates who don't feel safe have the option of protective custody.

Studies, though, show that option puts inmates at risk of severe psychological harm.

Even Gualtieri himself described that option as "hell."

• • •

Bello was not only assigned to male housing but strip-searched by two male deputies.

That violated Sheriff's Office policy. If it had been followed, a female deputy would have searched Bello from the waist up, then a male deputy would have finished the search.

Bello said she would have requested a female deputy had she known that was an option. Instead, she said nothing. She just wanted to get it over with.

"It felt like I didn't have a choice," she said.

When the *Times* asked Gualtieri to review Bello's treatment, he initially said the search was done properly. But when a *Times* reporter pointed out a record that showed otherwise, he said he had based his earlier answer on incorrect information.

Still, he defended his deputies, saying that, dressed in jail scrubs surrounded by other men, Bello "from what everyone is saying presented as a male." He said he would look at ways to help transgender people understand their options while in jail.

Case 8:20-cv-02005-TPB-AEP   Document 92   Filed 12/06/21   Page 32 of 39 PageID 1000

*Tampa Bay Times*

SUBSCRIBE

---

**RELATED:**  Pinellas Sheriff Bob Gualtieri is now the star cop in Florida politics. Who is he, and how did he get there?

---

That explanation did not sit well with Bello. She said she repeatedly told deputies her name and gender. She also pointed out that her gender was clear based on her appearance when she first entered the jail.

ADVERTISEMENT



POWERED BY CONCERT

Bello also struggled to treat her gender dysphoria.

She didn't have a current prescription for hormone therapy, which Gualtieri said is why she couldn't continue the treatment in jail. The sheriff said he wouldn't have had a problem with a jail doctor prescribing them, but Bello wasn't there long enough for that.

When she was booked into the jail she had no money for the commissary, she said, so she couldn't buy a bra to replace the one that was confiscated. She wasn't in jail long enough to obtain a package of necessities for indigent inmates that includes a bra.

Her hair extensions were confiscated. She didn't have access to tweezers to remove facial hair and, unlike the razors that inmates are provided, keep her skin soft and stubble-free. So she turned to toothpaste, letting it dry on her face and plucking each hair with her fingers.

And she didn't have makeup. Gualtieri said no inmates are allowed to wear makeup, regardless of gender identity.

So Bello used colored pencils from the commissary, gifted to her by a departing inmate, to mimic it. Deputies told her to remove it, she said. She thought in vain of the message from an old cosmetics commercial: "When you're having a bad day, just put on red lipstick."

*Tampa Bay Times*

SUBSCRIBE

Karla Bello applies lipstick before taking a walk. [ DOUGLAS R. CLIFFORD | Times ]

ADVERTISEMENT



POWERED BY CONCERT

"I understand it's jail. It's not supposed to be comfortable," Bello said. "But at the same time I'm trying to articulate why it was so wrong and painful and inhumane."

She spiraled into a deep depression and ended up in a single cell, under close observation by jail staff.

Up until that point, she was allowed to continue wearing a binding bottom undergarment called a gaff. But when she was placed under observation, deputies confiscated it as a safety precaution.

It was one blow too many, Bello said. She had a breakdown.

"I was so angry," she said. "I went crazy in there. They made me crazy."

• • •

**Need help?** If you or someone you know is contemplating suicide, reach out to the 24–hour National Suicide Prevention Lifeline at 1-800-273-8255; contact the Crisis Text Line by texting TALK to 741741; or chat with someone online at suicidepreventionlifeline.org. The Crisis Center of Tampa Bay can be reached by dialing 211 or by visiting crisiscenter.com.

• • •

074

---

*Tampa Bay Times*

SUBSCRIBE

On the other side of the jail video screen was Tampa lawyer Rook Elizabeth Ringer, who is also transgender. She heard about Bello's plight from a friend and came to check on her. Bello shared her story.

Ringer reached out to members of Trans Mission Media, a local transgender advocacy organization. The organization has an arm called the Canary Project focused on helping people like Bello, who are awaiting trial in jail with the wrong population.

ADVERTISEMENT

POWERED BY CONCERT

Bello needed their help, Ringer told members Penelope Minot and Stephanie Foglia. Bello's treatment troubled the group.

"Pinellas County and Hillsborough County are supposed to be LGBT-friendly ... then to have these atrocities," Foglia said. "The point is to be treated with dignity. It makes a difference."

Minot started a Facebook fundraiser to raise money to pay Bello's bail. They raised $795 and arranged a place for Bello to stay.

Bello walked out Dec. 10, bewildered but free.

Karla Bello attends a Pinellas County court hearing with her attorney, Rook Elizabeth Ringer. [ MARTHA ASENCIO RHINE | Times ]

**Tampa Bay Times**                                                                    SUBSCRIBE

"There should be a different way of doing things," she said. Jails "are not supposed to leave you feeling crippled, wanting to take your life."

Since she got out, Bello has moved to Tarpon Springs, into the home of a new client, and is figuring out her next steps. Last week, her license was reinstated after she paid her fines. She also pleaded down her criminal charge to a driving infraction.

On a recent afternoon, Bello sat with Ringer in a Pinellas County courtroom.

ADVERTISEMENT



POWERED BY CONCERT

Long blond hair fell over her shoulders. She wore an electric blue jacket with a black-and-white striped top, black skirt and over-the-knee boots. Pearl bracelets hugged her wrists.

She stared ahead, pursing her lips, shaded bright with pink-purple lipstick.

*Times senior researcher Caryn Baird contributed to this report.*

*Clarification: The Florida Model Jail Standards Committee cannot sanction jails. But jails can violate state laws. An official who advises the committee was imprecise on this point in an earlier version of this story.*

UP NEXT:  Is justice served in '70s murder case by DNA testing?

**KATHRYN VARN**
Breaking News Reporter — Pinellas Sheriff, St. Petersburg Police, St. Petersburg Courts

# Tampa Bay Times

SUBSCRIBE



A tribute to the Floridians taken by the coronavirus

## YOU MIGHT ALSO LIKE

**World Series: Rays-Dodgers Game 1 live updates**

Oct. 20

SPORTS    RAYS

**One dead when fifth-wheel trailer burns in Pinellas Park early Tuesday**

Earlier today

BREAKING NEWS    NEWS    PINELLAS

*Elvis' Wife Finally Admits What He Used to Ask from Her*
Past Factory

*One Simple Method To Keep Your Blood Sugar Below 100*
WeeklyPenny.com

*Man Who Predicted 2020 Crash Says "Now Is The Time"*
TheLegacyReport.com

Ads by Revcontent

SPONSORED CONTENT

*Forget Expensive Solar Panels. Do This Instead* ⬈

By *Push interactive - Easy Solar Savings*






**Florida reports 3,377 coronavirus infections Monday, 20 deaths**

Yesterday

NEWS    HEALTH    ARCHIVE    SPECIAL REPORTS    BREAKING NEWS    FLORIDA    HERNANDO    HILLSBOROUGH    LATEST    PASCO    PINELLAS

**Firm behind Florida unemployment mess will get $135 million state contract after all**

Oct. 22

NEWS    FLORIDA POLITICS    LATEST    HEALTH    BREAKING NEWS

**Fact-checking claims about Hunter Biden, Joe Biden, and China | PolitiFact**

Oct. 21

NEWS    FLORIDA    FLORIDA POLITICS    ELECTIONS

**Florida adds 5,558 coronavirus cases, the highest daily record since August**

Oct. 22

NEWS    HEALTH    BREAKING NEWS    FLORIDA    LATEST

**Tight Florida Senate races targeted by dark money group**

Earlier today

078

**Tampa Bay Times**

SUBSCRIBE

NEWS  FLORIDA POLITICS  ELECTIONS  FLORIDA

**Senate votes to advance Barrett; confirmation expected Monday**

Oct. 25

NATION WORLD  NEWS

**Iran may be behind 'spoofed' emails sent to Florida voters, say federal officials**

Oct. 21

NEWS  FLORIDA POLITICS  ELECTIONS  FLORIDA

**Florida adds 4,471 coronavirus cases, 76 deaths**

Oct. 24

NEWS  HEALTH

**No wrist slaps for illegally cutting down oak trees in Tampa | Editorial**

Yesterday

OPINION

079

Tampa Bay Times

SUBSCRIBE

A D V E R T I S E M E N T

A D V E R T I S E M E N T

A D V E R T I S E M E N T



© 2020 All Rights Reserved | **Tampa Bay Times**

Subscriptions

Newsletters

My Account

CONTACT US

ABOUT US

JOIN US

MEDIA KIT

PLACE AN AD

LEGAL DISCLAIMERS

LEGAL NOTICES

SPECIAL SECTIONS

