UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CARLOS RAUL BELLO NOGUEDA,
    a/k/a Karla Bello,

      Plaintiff,

v.                              Case No.  8:20-cv-2005-TPB-AEP

SHERIFF ROBERT GUALTIERI, *et al.*,

      Defendants.
_____/

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

THIS CAUSE comes before the Court on the Second Amended

Complaint (Doc. 84) filed by Plaintiff Carlos Raul Bello Nogueda, who prefers

the name Karla Bello. Plaintiff has sued seven defendants in connection with

her[1] twelve-day stay in the Pinellas County Jail in late 2019.

Also before the Court are the motions to dismiss filed by Defendant

Pinellas County (Doc.  85), Sheriff Robert Gualtieri (Doc. 87), and Defendants

Yvette Dixon, LMHC, Corporal Richard Merritt, Deputy Chris Moses,

Darlene Hilery, LPN, and Sergeant Jason Franjesevic (Doc. 88).  Plaintiff

---

[1] The Court uses the feminine pronoun in recognition of Plaintiff's expressed
preference.  The Court's use of this pronoun has no legal significance and should not
be interpreted as a determination that a person has a legally enforceable right to be
referred to by any particular pronoun.

Bello, who is represented by counsel, opposes the motions to dismiss

(Docs. 91, 92, 93), and Defendants Sheriff Gualtieri, Counselor Dixon,

Corporal Merritt, Deputy Moses, Nurse Hilery, and Sergeant Franjesevic

filed replies. (Docs. 97, 98).  For the reasons that follow, the motions to

dismiss (Docs. 85, 87, 88) are due to be granted.

## I.    Legal Standards

### A. Motion to Dismiss

Rule 8(a) of the Federal Rules of Civil Procedure requires that a

complaint contain "a short and plain statement of the claim showing the

[plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). "Although Rule 8(a) does

not require 'detailed factual allegations,' it does require 'more than labels and

conclusions'; a 'formulaic recitation of the cause of action will not do.' "

*Young v. Lexington Ins. Co.*, No. 18-62468, 2018 WL 7572240, at *1 (S.D. Fla.

Dec. 6, 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *report

and recommendation adopted*, No. 18-62468-CIV, 2019 WL 1112274 (S.D.

Fla. Jan. 9, 2019).  In order to survive a motion to dismiss, factual allegations

must be sufficient "to state a claim for relief that is plausible on its face."

*Twombly*, 550 U.S. at 555.

On a motion to dismiss, this Court accepts as true all the allegations in

the complaint and construes them in the light most favorable to the plaintiff.

*Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004).  This

Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990).  However, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

B. <u>Qualified Immunity</u>

"The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity "provides 'an immunity from suit rather than a mere defense to liability.' " *Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001)).  Thus, "[w]hile qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss; the motion will be granted if the 'complaint fails to allege the violation of a clearly established constitutional right.' " *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001) (quoting *Williams v. Ala. State. Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997)).

In invoking qualified immunity, a defendant must first prove that the challenged action was within the scope of the officer's discretionary authority. *Case*, 555 F.3d at 1325.  Here, the parties do not dispute that the individual defendants were acting within their discretionary authority.

The Court must then determine whether the plaintiff's allegations, if true, clearly establish a constitutional violation. *See Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010).  *See also Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1254 (11th Cir. 2010).  "[T]he Court must consider 'whether it would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Young v. City of Tampa*, No: 8:15-cv-226-T-35MAP, 2017 WL 5239473, at *4 (M.D. Fla. Mar. 6, 2017) (quoting *Maiorano v. Santiago*, No. 6:05-cv-107-Orl-19KRS, at *7 (M.D. Fla. May 19, 2005)).

## II.    Factual Background

Plaintiff was incarcerated in the Pinellas County Jail for twelve days – from November 29, 2019 to December 10, 2019.  In sum, Plaintiff claims the defendants violated her constitutional rights in various ways while she was in jail by denying certain medical assistance and treating her as a male.

The allegations in the Second Amended Complaint, along with the attachments, show that Plaintiff's Florida driver's license was suspended because she failed to pay multiple traffic citations.  She was later caught driving in Pinellas County, Florida, on a suspended license and charged

with a criminal traffic infraction that required a mandatory court appearance.  Plaintiff did not appear for her mandatory court appearance on November 4, 2019, so a Capias was issued for her arrest by a state court judge in the ordinary course.  (Doc. 84 at 10–11, ¶¶40–46).  On November 29, 2019, Plaintiff was arrested by the Gulf Port Police Department pursuant to the outstanding warrant.  (Doc. 84 at 11, ¶¶ 45–47).

Plaintiff was born with and had male genitalia at the time of her arrest and incarceration.[2]  Likewise, at the time of her arrest and incarceration Plaintiff had a "birth certificate and other identification documents [with] 'male' gender markers." (Doc. 84 at 24–25, ¶ 109). Consequently, when Plaintiff was booked into the Pinellas County Jail she was placed in the jail's male unit. (Doc. 84 at 11, ¶48; Doc. 84 at 12, ¶ 51; Doc. 84 at 16, ¶ 73; Doc. 84 at 80).  Plaintiff's jail admission assessment indicates that she is "LGBTI or gender non-conforming," specifically "transgender." (Doc. 84 at 11–12, ¶49; Doc. 84 at 99).  The jail also identified Plaintiff as "SVP—Potential Victim." (Doc. 84 at 16–17, ¶¶ 74–76; Doc. 84 at

---

[2] While the Second Amended Complaint spans 141 pages (including attachments), it very carefully avoids directly stating whether Plaintiff had male or female genitalia at the time of her arrest and incarceration in the Pinellas County jail.  However, based on the entirety of the Second Amended Complaint, and all attachments, and Plaintiff's failure to allege that she had female genitalia, it can be reasonably inferred that Plaintiff had male genitalia at the time of her arrest and incarceration.

5

88).  Plaintiff alleges that, "[a]t all times relevant to this action, and for several years prior to this action, [she] has been living publicly as a woman, in accordance with her gender dysphoria." (Doc. 84 at 9, ¶ 34).

Plaintiff alleges that gender dysphoria, a medical condition set forth in the Diagnostic and Statistical Manual of Mental Disorders, *American Psychiatric Assocation* (5th Ed. 2013), and the International Classification of Diseases-10, *World Health Organization* (1992), is "[t]he medical diagnosis for the incongruence between one's gender identity and one's sex assigned at birth and the clinical distress resulting from this incongruence." (Doc. 84 at 5–6, ¶¶ 23–24).  Plaintiff further alleges that, "[i]f left untreated, Gender Dysphoria can lead to serious medical problems, including clinically significant psychological distress, dysfunction, debilitating depression, and, for some people without access to appropriate medical care and treatment, self-harm, suicidality, and death." (Doc. 84 at 7, ¶ 25).  According to Plaintiff, "[t]he particular course of medical treatment varies based on the individualized needs of the person." (Doc. 84 at 9, ¶ 32).

Plaintiff further alleges that leading organizations accept the standards of care for treating Gender Dysphoria published by the World Professional Association for Transgender Health. (Doc. 84 at 7, ¶¶ 27–28 (citing Eli Coleman *et al.*, World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and*

*Gender-Nonconforming People* (Version 7 2012)).  Regarding inmates, those

standards provide:

> Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . . All elements of assessment and treatment as described in the SOC can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.

(Doc. 84 at 8 (quoting Coleman, *supra*, at 67)).  Further, according to

Plaintiff, the National Commission on Correctional Healthcare cites those

standards when "recommend[ing] that the medical management of prisoners

with gender dysphoria 'should follow accepted standards developed by

professionals with expertise in transgender health.' " (Doc. 84 at 8, ¶ 31

(quoting National Commission on Correctional Healthcare, *NCCHC Policy

Statement, Transgender Health Care in Correctional Settings* (Oct. 18, 2009,

reaffirmed with revision April 2015)).

Plaintiff alleges that "[h]ormone therapy is a medically recognized,

accepted, and appropriate treatment for Gender Dysphoria." (Doc. 84 at 46,

¶ 203).  Plaintiff alleges that, due to her use of hormone replacement therapy medication, she "has and had at all relevant times to this case, a completely female presentation, including full-sized female breasts, which require the wearing of female brassieres." (Doc. 84 at 10, ¶ 39).

However, Plaintiff admits that "at all times relevant to this action, and for several years prior to this action, [she] has been taking hormone replacement therapy . . . medications without a prescription." (Doc. 84 at 9–10, ¶¶ 35–36).  She attempts to explain her use of these medications without a valid prescription by stating, generally, that she did not have access to proper health care for gender dysphoria. *Id*.

The jail did not provide Plaintiff with hormone replacement medications.  According to Plaintiff, the "abrupt withdrawal of [hormone replacement therapy] medications can cause . . . severe depression, suicide, chest pains, psychosis, mood disorders, autonomic hyperactivity, heart palpitations, and many other serious health issues, as well as a partial reversal of the 'feminizing' effects of the [hormone replacement therapy]." (Doc. 84 at 10, ¶ 38).

While incarcerated on December 2, 2019, Plaintiff complained of chest pain, which she contends was due to not receiving hormone replacement medication. (Doc. 84 at 13, ¶¶54–55; Doc. 84 at 94).  According to jail records, while Plaintiff "showed no medical distress while eating h[er] meal tray,"

8

Deputy Moses "notified 6th Floor Control via telephone[,] who advised [him] to send [Plaintiff] out to see Nurse Hilery." (Doc. 84 at 116). Plaintiff was pat searched; then evaluated by Nurse Hilery, who cleared Plaintiff to remain in the assigned housing location. Corporal Merritt and Sergeant Franjesevic (the shift supervisor) agreed with the actions taken by jail staff. (Doc. 84 at 13, ¶¶58–60; Doc. 84 at 94, 116).[3]

The same day, Nurse Hilery visited the housing unit for diabetic checks. "Bello became extremely irate[,] yelling that [s]he needs h[er] medication. Nurse Hilery instructed h[er] to sign up for nurse sick call, as [Deputy Moses] did before [the nurse] arrived." (Doc. 84 at 15–16, ¶ 71; Doc. 84 at 81). Plaintiff was informally disciplined for her behavior through verbal counseling. (Doc. 84 at 15–16, ¶ 71; Doc. 84 at 81). The next day, December 3, 2019, Plaintiff was again informally disciplined in the form of verbal counseling for "applying colored pencil to h[er] eyebrows and to h[er] face as makeup." (Doc. 84 at 16, ¶72; Doc. 84 at 81).

On December 6, 2019, Plaintiff was seen by Yvette Dixon, LMHC. (Doc. 84 at 14, ¶ 65; Doc. 84 at 50, ¶ 218; Doc. 84 at 120). "During the course

---

[3] The following were also notified: Shift Commander Sergeant Vieno, Department Commander Colonel Danzig, and Division Commander Captain Napier. (Doc. 84 at 14, ¶ 62; Doc. 84 at 116). These individuals are not named as defendants in this action.

of that session, Defendant Dixon became aware of [Plaintiff's] use of a bra to properly contain her breasts." (Doc. 84 at 50, ¶ 219).  Counselor Dixon notified Corporal Merrit of the contraband undergarment and placed Plaintiff on "close observation" status. (Doc. 84 at 14, ¶ 65; Doc. 84 at 50, ¶ 220; Doc. 84 at 120).  Following that visit,

> [u]tilizing the Attorney Visitation room for privacy, [Plaintiff's] personal undergarments were confiscated by [Corporal Merritt].  [Plaintiff] was then seated adjacent to the Officer's Station in the 6th floor hallway and kept under constant observation.  Once [Plaintiff's] relocation was scheduled . . . , [Corporal Merritt] escorted [Plaintiff] to Pre-Housing to await transport to the Healthcare Building.  All of [Plaintiff's] personal property was inventoried and sent to the Property Room.[4]

(Doc. 84 at 14–15, ¶ 65; Doc. 84 at 50, ¶ 221; Doc. 84 at 120).  Sergeant Franjesevic "agree[d] with the actions taken by staff." (Doc. 84 at 15, ¶ 67; Doc. 84 at 120).[5]

On December 9, 2019, Plaintiff requested her debit card, makeup bag, underwear, coffee bag, and colored pencils from the property room. (Doc. 84 at 17¶ 77; Doc. 84 at 96). In response to that request, Plaintiff was informed:

---

[4] According to the inventory form, Plaintiff's underwear, coffee, colored pencils, and "other" unspecified item(s) were sent to the property room. (Doc. 84 at 15 ¶ 69; Doc. 84 at 121).

[5] The following were also notified: Shift Commander Sergeant Vieno, Department Commander Colonel Danzig, and Division Commander Captain Napier. (Doc. 84 at 15, ¶ 70; Doc. 84 at 120).

"You can't receive your debit card number to place commissary orders.  No makeup i[s] allowed.  If you have personal undergarments that would not be considered contraband, you can request those items." (Doc. 84 at 17, ¶ 78; Doc. 84 at 96). On December 10, 2019, Plaintiff requested permission to file a grievance related to the issue, explaining:

> i ned a bra at minimum, im a ts woman, transgender, and ben on hrt over three years to grow a bust. why do i have to show every man my boobs when i get changed.  my chest huts due to anxiety or potasium levels unbalanced. due not getting hrt since ive ben here. its hard to breath at times.

(Doc. 84 at 17, ¶ 79; Doc. 84 at 93).  Plaintiff was granted permission to file the grievance, but the matter was ultimately closed due to Plaintiff's release.[6] (Doc. 84 at 93).

Plaintiff also alleges that jail reports improperly identified her as male (Doc. 84 at 13–15, 116, 120) and that Sergeant Franjesevic and others dehumanized her by using male pronouns, refused to acknowledge that she

---

[6] As a matter of public record "capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned," [t]he Court takes judicial notice of publicly available records from the website of the Pinellas County Sheriff's Office documenting that Plaintiff was released on bond on December 10, 2019. *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010); *see also* Fed. R. Evid. 201(b), (c); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)) (explaining that, when faced with a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

was a woman, and deliberately mocked her hormone withdrawal concerns. (Doc. 84 at 13–15, 45, 52, 54, 57, 116, 120).

Plaintiff alleges that the policy, practice, and custom of the Pinellas County Sheriff's Office, as implemented by Sheriff Gualtieri and Pinellas County (Doc. 84 at 82), is "to treat transgender inmates according to their sex assigned at birth, putting transgender women in jail with men, and transgender men in jail with women, regardless of their physical or medical characteristics." (Doc. 84 at 19, ¶88). Plaintiff further claims that the Pinellas County Sheriff's office has a "persistent and widespread practice of denying hormone replacement therapy to transgender detainees and refusing to address the medical dangers of the side effects caused by withdrawal of hormone replacement therapy medications." (Doc. 84 at 20).

Relying on a story in the Tampa Bay Times, Plaintiff alleges that Sheriff Gualtieri admitted to "the harmful nature of the policies and procedures of [the] P[inellas] C[ounty] S[heriff's] O[ffice] and the Pinellas County Jail with respect to transgender detainees." (Doc. 84 at 21).[7]

Overall, Plaintiff claims that Defendants were recklessly and deliberately indifferent to her serious medical needs and violated her right to equal protection. Plaintiff seeks compensatory and punitive damages against

---

[7] Varn, Kathryn, *Misgendered and mistreated in jail: a Pinellas transgender woman shares her story*, Tampa Bay Times, March 10, 2020); *see also* Doc. 84 at 124–37.

all Defendants, as well as declaratory and injunctive relief against Pinellas
County and Sheriff Gualtieri.

## III.   Analysis

Plaintiff's Second Amended Complaint asserts nine separate counts for
relief — five claims against Pinellas County and Sheriff Gualtieri as
policymakers for the Pinellas County Jail, and four claims against the
individually named Defendants.  Initially, it must be recognized that Plaintiff
cannot pursue a claim against either Pinellas County or Sheriff Gualtieri in
their policymaking or supervisory capacities unless a claim for an underlying
constitutional violation can be stated. *See Case v. Eslinger*, 555 F.3d 1317,
1328 (11th Cir. 2009).  Consequently, the Court begins with Plaintiff's claims
alleging constitutional violations against Counselor Dixon, Corporal Merritt,
Deputy Moses, Nurse Hilery, and Sergeant Franjesevic.

### A. Individual Capacity Claims

#### 1.  Deliberate Indifference to a Serious Medical Need

In Count VI, Plaintiff sues Deputy Moses, Nurse Hilery, and Sergeant
Franjesevic for failing to provide hormone replacement therapy, which
Plaintiff claims is a medically necessary treatment for gender dysphoria.
(Doc. 84 at 42–48).  Plaintiff alleges that Deputy Moses and Nurse Hilery did
not take Plaintiff's complaint of chest pains seriously and "refused to provide
[Plaintiff] with hormone therapy or to recommend that she be permitted

13

access to medical or psychological personnel willing to prescribe [hormone replacement therapy]. Plaintiff asserts that this refusal was not based on a medical judgment concerning medical needs." (Doc. 84 at 44, ¶¶ 192–194 & 199).

Plaintiff further alleges that Sergeant Franjesevic, when agreeing in his report with the steps taken by staff regarding Plaintiff's complaints, mocked Plaintiff's medical issues "by us[ing] male pronouns to describe [her], and . . . us[ing] mocking scare-quotes around the words 'chest pains.' " (Doc. 84 at 14 ¶ 61; Doc. 84 at 45, ¶ 195; Doc. 84 at 116). Plaintiff also takes issue with the fact that Franjesevic reported that he agreed with the staff actions of confiscating Plaintiff's undergarments and placing Plaintiff on close observation status. (Doc. 84 at 15, ¶ 67; Doc. 84 at 120). Plaintiff claims that Sergeant Franjesevic, like Deputy Moses and Nurse Hilery, "refused to provide Plaintiff with hormone therapy or to recommend that she be permitted access to medical or psychological personnel willing to prescribe [hormone replacement therapy]." (Doc. 84 at 44, ¶¶ 192–194; Doc. 84 at 45, ¶ 199).

In Count VIII, Plaintiff claims that Corporal Merritt and Counselor Dixon "were aware of [her] Gender Dysphoria, that she was a transgender woman, that she had been socially transitioned and living as a woman for many years, and that she was in severe psychological and emotional distress"

14

because she was not being provided hormone replacement therapy at the jail. (Doc. 84 at 56, ¶ 251). Yet, they "knowingly refused to provide [her] with this medically necessary treatment for her Gender Dysphoria, even though they knew that this was a recognized, accepted, and medically necessary treatment for Gender Dysphoria." (Doc. 84 at 56, ¶ 252).

Plaintiff further claims Corporal Merritt and Counselor Dixon deprived her of her Fourteenth Amendment rights and subjected her to cruel and unusual punishment by "forcing her to expose herself and her fully formed female breasts to members of the male sex, including both inmates and Pinellas County Jail employees." (Doc. 84 at 56, ¶ 253). Plaintiff claims she was also subjected to the "forced removal of her female undergarments by male Pinellas County jail employees; refusal to allow [her] to wear female undergarments; forcible searches by male officers; and by dehumanizing [her] gender identity by refusal to acknowledge that she is a woman." (Doc. 84 at 56–57, ¶ 253).

Overall, Plaintiff claims that "[i]t is medically necessary for [her] to live as a female, to receive hormone therapy, and to receive all other treatment for Gender Dysphoria deemed medically necessary by a qualified provider" (Doc. 84 at 45, ¶ 198), and that Defendants' described actions constitute deliberate indifference to her serious medical needs. (Doc. 84 at 46, ¶ 202; Doc. 84 at 56, ¶ 252).

"The Eighth Amendment's prohibition on conditions of confinement that amount to cruel and unusual punishment . . . applies to pre-trial detainees through the Fourteenth Amendment's due process clause." *Bennett v. Chitwood*, 519 F. App'x 569, 573–75 (11th Cir. 2013) (citing *Wilson v. Blankenship*, 163 F.3d 1284, 1291 (11th Cir.1998); *Hamm v. DeKalb County*, 774 F.2d 1567, 1573–74 (11th Cir.1985)). To state a claim for deliberate indifference to a serious medical need, Plaintiff must first "set forth evidence of an objectively serious medical need. Second, . . . [P]laintiff must prove that the prison official acted with an attitude of 'deliberate indifference' to that serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003); *see also Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

The Eleventh Circuit has held that an objectively serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). To demonstrate deliberate indifference, Plaintiff must show the following: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003) (citations omitted).

16

The allegations in the Second Amended Complaint do not set forth evidence of an objectively serious medical need, or that any official acted with an attitude of deliberate indifference.  Plaintiff claims that Sergeant Franjesevic, Deputy Moses, and Nurse Hilery were aware, through her records at the jail, that Plaintiff has Gender Dysphoria, was receiving hormone therapy for at least three years, and was a transgender woman who lived as a female prior to her incarceration. (Doc. 84 at 45, ¶ 197; Doc. 84 at 46 at ¶ 204). Similarly, Plaintiff claims that Corporal Merritt and Counselor Dixon were aware of her gender dysphoria, that she was transgender, and that she had been living as a woman for many years. (Doc. 84 at 56, ¶ 251). Plaintiff further alleges that Sergeant Franjesevic, Deputy Moses, Nurse Hilery, Corporal Merritt, and Counselor Dixon were aware that she was in severe physical and emotional distress due to her failure to receive hormone replacement therapy while at the jail. (Doc. 84 at 46, ¶ 204; Doc. 84 at 56, ¶ 251).

But Plaintiff does not allege that she was following a current treatment plan prescribed by a physician or other medical professional.  *Rather, she admits that, at the time of her arrest, she had not obtained health care for her gender dysphoria and that she had taken hormone replacement therapy without a prescription (i.e., illegally) for three years.*  Thus, Plaintiff argues that the defendants in this case acted unlawfully by not providing

17

prescription drugs to her while she was in jail that she herself could not lawfully possess.  In addition, Plaintiff concedes that treatment for gender dysphoria varies based on the needs of the individual and that hormone therapy is a medically accepted treatment, but not the only medically accepted treatment for an individual with gender dysphoria.

Further, Plaintiff does not allege that Sergeant Franjesevic, Deputy Moses, Nurse Hilery, Corporal Merritt, or Counselor Dixon had the authority or ability to provide her with the prescription medication she desired.  Similarly, Plaintiff does not allege that Counselor Dixon or Corporal Merritt had the authority to give Plaintiff permission to wear female clothing or undergarments and observe female grooming standards such as using makeup. Nor does Plaintiff allege that she requested, but was denied, a medical evaluation for a gender dysphoria diagnosis and treatment plan.[8]

Plaintiff contends that Nurse Hilery erred by sending Plaintiff back to the housing unit following Plaintiff's complaint of chest pain.  However, while Plaintiff alleges that her withdrawal symptoms were "serious, life-

---

[8] Plaintiff faults Deputy Moses, Nurse Hilery, and Sergeant Franjesevic for "refus[ing] . . . to recommend that [Plaintiff] be permitted access to medical or psychological personnel willing to prescribe [hormone replacement therapy]." (Doc. 84 at 44, ¶¶ 192–194; Doc. 84 at 45, ¶ 199).  While this statement implies that Plaintiff requested to be seen by someone who would write her the desired prescription(s), it does not equate to an allegation that she actually requested an evaluation for a gender dysphoria diagnosis and treatment plan – in point of fact, she never made such a request.

threatening, and debilitating," Plaintiff does not support that allegation with any specific facts. *See, e.g.*, *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984) ("[M]ore than mere conclusory notice pleading is required. In civil rights actions, it has been held that a complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory.").  It is reasonable to expect that someone who has truly suffered "serious, life-threatening, and debilitating" medical conditions while in a jail could easily provide factual support for such an allegation, but no such support has been provided.

Plaintiff also alleges that she "suffered severe psychological distress and physical harm, including suicidal ideation/suicide attempts, such that she was placed on psychiatric observation in the Pinellas County Jail's Mental Health Treatment Unit." (Doc. 84 at 46, ¶ 200).  But other than vague allegations of chest pain, Plaintiff does not describe any physical harm suffered, and does not allege that her chest pain got worse, that her physical condition deteriorated, or that she made any further medical requests related to her chest pain or any other hormone withdrawal symptoms.  Plaintiff also fails to specify any suicide attempt and contradicts her allegation that she was placed on psychiatric observation due to suicidal ideation and attempt when she states that she was placed on "close observation" status following

her meeting with Counselor Dixon and the confiscation of her undergarments. (Doc. 84 at 14–15, 50, 120).

Ultimately, Plaintiff concedes she was evaluated by the nurse for complaints of chest pain, but simply disagrees with the nurse's assessment that she could return to the housing unit without the treatment that she sought. This does not demonstrate the disregard of a serious medical need by more than negligence.

Plaintiff also alleges that jail personnel violated her constitutional rights by using male pronouns and refusing to acknowledge she is a woman. Initially, it should be noted that it is undisputed that Plaintiff's birth certificate and other identification documents, including her Florida driver's license, indicated Plaintiff was a male. Moreover, Plaintiff's legal first name is Carlos — a name commonly associated with males. There is no allegation that Plaintiff obtained a legal name change or changed the gender designation on her Florida driver's license. Both of these steps are available under existing Florida law. In any event, the actions that Plaintiff cites do not rise to the level of a constitutional violation under existing law. *See, e.g., Richburg v. Dep't of Corr.*, No. 2:19-cv-598-ECM-WC, 2019 WL 6769003, at *3 (M.D. Ala. Nov. 8, 2019) (citing, among others, *Hernandez v. Fla. Dep't of Corr.*, 281 Fed. App'x 862, 866 (11th Cir. 2008); *Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989)) ("Derogatory, demeaning, profane,

20

threatening or abusive comments made by an officer to an inmate, no matter how repugnant or unprofessional, do not rise to the level of a constitutional violation.").

Under the circumstances presented, Plaintiff fails to plausibly allege that Sergeant Franjesevic, Deputy Moses, Nurse Hilery, Corporal Merritt, or Counselor Dixon were subjectively aware of, and disregarded by more than mere negligence, a risk of serious medical harm to Plaintiff. Moreover, because "there can be no supervisory liability . . . if there was no underlying constitutional violation," *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) (quoting *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008)), Plaintiff cannot hold Sergeant Franjesevic or Corporal Merritt liable for agreeing, in reports, with the actions of the jail staff.

Accordingly, because Plaintiff fails to sufficiently allege a constitutional violation, Sergeant Franjesevic, Deputy Moses, Nurse Hilery, Corporal Merritt, and Counselor Dixon are entitled to qualified immunity, and Counts VI and VIII are dismissed.

2. Equal Protection

In Counts VII and IX, Plaintiff alleges that Corporal Merritt, Counselor Dixon, Sergeant Franjesevic, Deputy Moses, and Nurse Hilery violated her right to equal protection.

In Count VII, Plaintiff claims that Corporal Merritt and Counselor Dixon discriminated against her, based on her transgender status, by confiscating her female undergarments, "refus[ing] to provide [her] with female undergarments or to recommend that she be permitted access to female clothing and grooming standards," and "prohibit[ing] her from any social transitioning whatsoever." (Doc. 84 at 50–51, ¶¶ 225–26). She further contends that Corporal Merritt and Counselor Dixon deprived her of her Fourteenth Amendment rights by

> subjecting her to completely different standards than similarly situated non-transgender women, solely because of her transgender status, including, but not limited to: forcing her to shower with and/or expose herself and her fully formed breasts to members of the male sex, including both inmates and Pinellas County Jail employees, including Defendant Merritt; forced removal of her female undergarments by Defendant Merritt; refusal to allow [her] to wear female undergarments; dehumanizing [her] and causing psychological and emotional trauma . . . by their refusal to provide [her] with her proper undergarments and grooming items; and by dehumanizing [her] gender identity by their refusal to acknowledge that she is a woman.

(Doc. 84 at 54, ¶ 245).

In Count IX, Plaintiff contends that Sergeant Franjesevic, Deputy Moses, and Nurse Hilery

> subject[ed] her to completely different standards than similarly situated non-transgender women, solely because of her transgender status, including but not

limited to: refusal to provide hormone therapy treatment o[f] any kind, or even to arrange for a doctor to prescribe the same during her detainment and incarceration, although similarly-situated non-transgender women would be able to obtain hormone therapy or other necessary medical care; and by dehumanizing [her] and refusing to provide any medical aid for her serious, life-threatening, and debilitating withdrawal symptoms directly caused by their refusal to provide [her] with her hormones and other medications,[9] where similarly-situated non-transgender women would not have been subjected to this mistreatment.

(Doc. 84 at 59, ¶ 261).

An equal protection claim arises when a plaintiff alleges that similarly situated individuals are treated differently without a rational relationship to a legitimate state purpose. *See San Antonio School District v. Rodriguez*, 411 U.S. 1 (1972). "To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318–19 (11th Cir. 2006) (citing *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001)).

---

[9] Besides the desired hormone replacement therapy, Plaintiff does not indicate what other medication she requested but was denied.

The Court does not decide, however, whether the Defendants' actions violated Plaintiff's constitutional right because, in this case any such right is not clearly established.

As noted earlier, an official is entitled to qualified immunity unless the alleged conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (citation and internal quotation merks omitted). "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Priester v. City of Riviera beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000). The "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (citation and internal quotation marks omitted) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

To demonstrate the law was clearly established, a plaintiff may identify decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the relevant state's highest court — here, the Florida Supreme Court — that provide clear notice of the violation. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007); *Priester v. City of Riviera Beach*,

24

208 F.3d 919, 926 (11th Cir. 2000).  Existing law in this area is not clearly established in Plaintiff's favor.

Plaintiff points to *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty., Fla.*, 318 F. Supp. 3d 1293 (M.D. Fla. 2018), *aff'd sub nom. Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286 (11th Cir. 2020), *opinion vacated and superseded sub nom. Adams v. Sch. Bd. of St. Johns Cnty., Fla.*, 3 F.4th 1299 (11th Cir. 2021), *reh'g en banc granted, opinion vacated*, 9 F.4th 1369 (11th Cir. 2021), *aff'd sub nom. Adams v. Sch. Bd. of St. Johns Cty., Fla.*, 3 F.4th 1299 (11th Cir. 2021), *reh'g en banc granted, opinion vacated,* 9 F.4th 1369 (11th Cir.  2021). (Doc. 84 at 53, ¶ 247).  That case, however, involved a transgender student who sued the county school board.  The student alleged violation of his rights under the Equal Protection Clause and Title IX of the Education Amendments Act of 1972 because he was not permitted to use the boys' bathroom at his high school.  The case did not involve an inmate in the custody of a county jail.  Further, the plaintiff in that case, among other things, was diagnosed with gender dysphoria by his psychologist, was treated by an endocrinologist who prescribed birth control and testosterone, had a double mastectomy, and changed his gender on his driver's license and birth certificate, *id.* at 1300–01 — facts entirely different than those presented by Plaintiff here.

Plaintiff also cites *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (Doc. 84 at 49), where the Eleventh Circuit held that "discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause." In that case, however, the facts again differ significantly. The plaintiff was a transgender editor at the Georgia General Assembly's Office of Legislative Counsel who had been diagnosed with gender identity disorder, was transitioning from male to female "under the supervision of health care providers," and was fired from her job when she informed her supervisor "that she was ready to proceed with gender transition[,] . . . would begin coming to work as a woman[,] and was also changing her legal name." *Id.* at 1314.

Plaintiff additionally cites *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1305 (N.D. Fla. 2018), as the "law in place during the entirety of the time that [she] was in the [j]ail." (Doc. 93 at 9–13). Plaintiff's citation to this decision is not helpful. To begin with, in 2020 it was vacated by the Eleventh Circuit. See *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1278 (11th Cir. 2020).[10] Even if it had not been vacated by the Court of Appeals, it was

---

[10] The Eleventh Circuit held that the plaintiff's "challenges to the FDC's former freeze-frame policy and its initial failure to provide her with hormone therapy [were] moot, and . . . reject[ed] on the merits her claim that the FDC violated the Eighth Amendment by refusing to accommodate her social transitioning-related requests." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1278 (11th Cir. 2020).

not a decision of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Florida Supreme Court and, therefore, cannot provide the clearly established law required to defeat a qualified immunity defense.  And even if the decision had been from an appropriate court, the case is factually distinguishable.  In *Keohane*, the prisoner-plaintiff had been formally diagnosed with gender dysphoria in her teens, began a hormone therapy regimen under the care of her pediatric endocrinologist, and legally changed her name to conform with her gender identity. *Id.* at 1292–93, 1295.

Plaintiff additionally cites *Bostock v. Clayton County*, — U.S. —, 140 S. Ct. 1731, 1741 (2020), and *Kothman v. Rosario*, 558 F. App'x 907, 911 (11th Cir. 2014). (Doc. 84 at 49, 52, 56). In *Bostock* the Supreme Court stated that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," 140 S. Ct. at 1741. *Bostock* did not involve prisoners confined in a jail or other penal institution, but instead involved three cases in which an employee was fired "after the employee revealed that he or she is homosexual or transgender — and allegedly for no reason other than the employee's homosexuality or transgender status." 140 S. Ct. at 1737.  *Bostock* has nothing to do with the case currently before this Court.

Further, although *Kothmann* involved a prisoner confined by the Florida Department of Corrections, the unpublished decision is not

controlling authority. *See* 11th Cir. R. 36-2.  In any event, the facts are distinguishable because the plaintiff in *Kothman* had a gender identity disorder diagnosis, was prescribed hormone therapy, and had undergone a number of surgical procedures as part of his medical treatment. *Kothman*, 558 F. App'x at 908.

Plaintiff simply has not identified, and the Court has not located, any opinion by the Florida Supreme Court, the Eleventh Circuit Court of Appeals, or the United States Supreme Court establishing an incarcerated inmate's constitutional right to hormone replacement therapy; social transitioning measures (*e.g.*, female clothing and grooming practices); or to be addressed with preferred pronouns, in the absence of a current treatment plan from a medical professional or a valid prescription for hormone replacement therapy.

Moreover, although Plaintiff argues in conclusory fashion to the contrary (Doc. 84 at 55, 57), it is not obvious or apparent that Plaintiff was deprived of her equal protection rights by Defendants' actions. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citation omitted) (explaining that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been

held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.").

Plaintiff does not explain why it would be obvious that court decisions relating to the equal protection rights of transgender individuals in employment and school settings, for example, would be required to apply in a jail or other custodial setting.  Further, although cases such as *Keohane* and *Kothman* involve correctional settings, Plaintiff does not explain why such cases would make it apparent to a jail official that the jail is constitutionally required to provide an inmate with hormone therapy or social transitioning measures that she had not been prescribed.  Plaintiff's argument on this point is inconsistent with common sense – how could the Pinellas County jail personnel have acted unlawfully by refusing to provide Plaintiff with prescription drugs that she herself was not allowed to lawfully possess?

Consequently, Corporal Merritt, Counselor Dixon, Sergeant Franjesevic, Deputy Moses, and Nurse Hilery are entitled to qualified immunity on Plaintiff's equal protection claims. Counts VII and IX are dismissed.

B. Claims Against the Policymaking Defendants

In addition to the individual capacity suits discussed above, Plaintiff also asserts five claims against Pinellas County and Sheriff Gualtieri as policymakers for the Pinellas County Jail.  Plaintiff claims the Sheriff and

the County violated her equal protection rights and were deliberately indifferent to her serious medical needs by enacting written and unwritten policies that, among other things, kept her from receiving hormone replacement therapy and required her to be housed with the male population at the jail.  She claims that the Sheriff and the County also ratified the behavior of the individually named Defendants.

The Court need not review these claims because Sheriff Gualtieri and Pinellas County cannot be held liable in the absence of a constitutional violation by the individually named defendants. *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the [action] is quite beside the point.").  Because Plaintiff does not state a claim against the individual Defendants, her claims (Counts I–V) against Pinellas County and Sheriff Gualtieri are also dismissed.

## IV.   Conclusion

For the forgoing reasons, it is **ORDERED** that:

1. The Defendants' motions to dismiss (Docs.  85, 87, 88) are

   **GRANTED**;

2. This action is **DISMISSED with prejudice**; and

3.  The Clerk is directed to enter judgment accordingly and **CLOSE**

this case.

**DONE** and **ORDERED** in Tampa, Florida on September 30, 2022.

_____

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**

31